# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

*David E. Patton*
Executive Director
*and Attorney-in-Chief*

*Southern District of New York*
*Jennifer L. Brown*
*Attorney-in-Charge*

June 14, 2023

**VIA ECF (REDACTED)**
**VIA EMAIL (UNREDACTED)**

The Honorable Mary Kay Vyskocil
United States District Court
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

Re: ***United States v. Jeffrey Parket***
 **22 Cr. 311 (MKV)**

Dear Judge Vyskocil:

We respectfully submit this letter on behalf of Jeffrey Parket in advance of his sentencing scheduled for June 28, 2023.

Mr. Parket stands before the Court in deep remorse and shame. After realizing in late 2021 that he could no longer live with the lies that he had told, Mr. Parket confessed his fraud in full to the United States government, has pled guilty, and knows that he must now face the consequences. There is no dispute that Mr. Parket's offense is serious and caused suffering to numerous victims, many of whom were close to him. Wracked with guilt over the severe pain that he caused, he has spent every waking moment since his confession working to earn money to repay his victims for their losses. Although the restitution judgment is large, he has developed and implemented a concrete plan to earn money to pay back his victims: researching and filing five massive whistleblower cases with the U.S. Securities and Exchange Commission ("SEC") that allege billions of dollars in wrongdoing. As will be explained more fully below, bringing those cases has required extraordinary effort from Mr. Parket and he continues to research additional cases to increase his chances of recovering money for his victims. The success of these cases and any hope of him being able to pay restitution depend on his ability to research and file new cases and supplement his existing ones.

Hon. Mary Kay Vyskocil                                    June 14, 2023
Re:   *United States v. Jeffrey Parket*, 22-cr-311 (MKV)        Page 2

Because of Mr. Parket's single-minded focus on repaying his victims, he
humbly asks the Court to impose a sentence of time served, a substantial term of
supervised release, and include home detention as a condition of his supervised
release. We understand that this may seem like an extraordinary request
considering the seriousness of the offense and the advisory Guidelines range, and
we do not make it lightly. On the unusual circumstances of this case, however,
including that Mr. Parket voluntarily confessed his crime and his only hope of
repaying his victims depends on him continuing to work on his whistleblower cases,
a substantial sentence of home detention satisfies the requirements of Section
3553(a).

As a result of Mr. Parket's horrible choices, he has lost everything that
matters to him—his wife, two of his sons, and ███████████████████
███████████████—and he knows that he must face additional punishment from
the Court. He only asks that the Court show him leniency so that he has as many
years as possible outside of prison to pursue his efforts to pay restitution.

## I.    Mr. Parket's Personal History

Mr. Parket was born in the Bronx and just turned 60 years old. PSR ¶ 54.
He has a younger sister, Allison Berman, who lives in New York. *Id.* ¶ 55. Mr.
Parket grew up in a loving family, and although they were not wealthy, he never
wanted for any of life's necessities. A few years after his birth, his mother, who had
been a schoolteacher, decided to stay at home to raise him. *Id.* ¶ 56. His father
worked at an electronics company and, when that closed, he returned to school to obtain
his master's degree and Ph.D. and later became a college professor at
Baruch. *Id.* Mr. Parket's father was his best friend and they remained close until
his sudden death in 2018.

When he was 13 years old, Mr. Parket experienced the major trauma of his
childhood: his mother was diagnosed with breast cancer. PSR ¶ 57. His father
spent his entire savings on his mother's medical care. *Id.* The cancer spread
quickly and Mr. Parket's mother was often in the hospital or in a hospital bed at
home because she had limited mobility due to the treatment. *Id.* ¶ 58. Mr. Parket
tended to his mother while managing a demanding workload at school, where he
continued to excel despite the challenges at home. *Id.* His mother died when he
was 15 years old, which was the worst moment of his childhood. *Id.* Mr. Parket
never fully recovered from the trauma of losing his mother. Exhibit 5, Letter of
Victor Rousso. His father remarried shortly thereafter, and Mr. Parket went to
college at the University of Chicago, from which he graduated in three years. *See
id.* ¶ 59. After college, he earned a Master's in Business Administration from the

Hon. Mary Kay Vyskocil                                June 14, 2023
Re:    *United States v. Jeffrey Parket*, 22-cr-311 (MKV)        Page 3

University of Michigan.  *Id.* ¶ 79.

Mr. Parket then had a successful career in the financial industry for many years, quickly moving up the ranks at several jobs in the financial sector.  PSR ¶¶ 81-87.[1]  After being the head of an asset manager between 2002 and 2006, he became an independent investor.  *Id.* ¶¶ 81-82.  At first he enjoyed some success as an independent investor, but then he incurred large losses, especially in the months leading up to his commission of this offense.

In 1989, Mr. Parket met and married the love his life, Robyn.  PSR ¶ 61.  For many years they enjoyed a happy marriage and had three sons together.  Exhibit 3, Letter of Robyn Parket.  Mrs. Parket describes Mr. Parket as a "wonderful father" who was "always there for" their sons, "whether on the sports field or during their school years."  *Id.*  As their sons grew up, Mr. Parket "became more of a friend to them," providing them with "advice and guidance."  *Id.*  Mr. Parket "was and is a loving husband and father" and the "world revolved around his family and his dedication to them was unmatched in society today."  Exhibit 5, Letter of Victor Rousso.  His son, Brett Parket, who is also a victim of this offense, describes Mr. Parket as his "north star" who "made his life all about family."  Exhibit 2, Letter of Brett Parket.  Brett notes that Mr. Parket was home every night for dinner, attended every parent-teacher conference, and paid close attention to his sons.  *Id.*  His close friend of almost 27 years, Homayoun Sasson, writes that Mr. Parket loved his sons and proudly put them through college, creating a "dream family to model after."  Exhibit 7, Letter of Homayoun Sasson.

Prior to this offense, Mr. Parket was a "very trusted and well respected man" whom Mrs. Parket trusted completely.  Exhibit 3, Letter of Robyn Parket.  Brett Parket notes that his father was "described and teased over the years as being the most pathetically honest person that anyone could ever meet."  Exhibit 2, Letter of Brett Parket.  Although Mrs. Parket has been devastated by Mr. Parket's offense and they are currently separated with a divorce proceeding pending, Mrs. Parket asks the Court to be "kind in sentencing Jeffrey" to avoid "bringing more pain and suffering to [her] family."  Exhibit 3, Letter of Robyn Parket.

---

[1] Paragraph 83 of the PSR incorrectly reports that Mr. Parket was stationed in California when he worked at KBC Bank, when in fact he was only on a business trip to California during the September 11, 2001, attacks.  We therefore respectfully request that the PSR be amended to reflect that Mr. Parket was living in New York at the time.  *See* Appendix A (remaining PSR corrections).

Hon. Mary Kay Vyskocil                                    June 14, 2023
Re:   *United States v. Jeffrey Parket*, 22-cr-311 (MKV)         Page 4

Mr. Parket's friends echo his wife and son's descriptions of him.  Victor
Rousso, a friend and victim of the offense, writes that Mr. Parket was a great help
to his family over many years.  Mr. Parket was friends with Mr. Rousso's wife first,
and helped her when her late husband became ill and passed away.  Mr. Parket
"went way above and beyond with compassion and kindness to her and her family,"
bringing the children gifts and taking them to sports games.  Exhibit 5, Letter of
Victor Rousso.  After Mr. Rousso and his wife married, Mr. Parket continued to
provide unrelenting support, assisting with his children's schoolwork, college
applications, and acting as a mentor to them.  *Id.*  Mr. Parket also helped Mr.
Rousso when Mr. Rousso's business was struggling.  *Id.*  In short, Mr. Parket was
the "go-to person for many friends and especially his family."  *Id.*  Anthony Bosco,
a friend of Mr. Parket's for over twenty-five years, writes that he viewed Mr. Parket
as a "good and moral person" who always did things "by the book."  Exhibit 6, Letter
of Anthony Bosco.

Although Mr. Parket's family has largely abandoned him, he remains in close
touch with his sister, Allison Berman, and his son, Brett Parket.  Ms. Berman, who
is a salesperson for a tile company, ███████████████████████ and
expressed her "unconditional support" for Mr. Parket.  PSR ¶¶ 55, 63.  Prior to this
offense, the word that she would have used to describe Mr. Parket is "moral," and
she notes that he was a protective older brother to her, especially after their mother
died.  Exhibit 4, Letter of Allison Berman.  She always knew him as someone who
"did what he thought was right."  *Id.*  Mr. Parket's commission of the offense
"conflicted so completely" with the person who she had known for her entire life.  *Id.*
Brett Parket feels the same way, writing that the offense is a "complete aberration"
and that something "terrible" must have been going on with Mr. Parket "for him to
go against a life of integrity."  Exhibit 2, Letter of Brett Parket.

For the first 55 years of his life, Mr. Parket never broke the law.  This case
represents his first encounter with the criminal justice system of any kind.

**II.    The Offense Conduct and ███████████████████**

There is no dispute that Mr. Parket committed a serious offense that harmed
many people and institutions.  In 2018,[2] Mr. Parket was "dealt with a terrible blow"

---

[2] Mr. Parket pled guilty to an offense that began in 2016, and the government
acknowledges that he started misrepresenting his assets to obtain loans in 2018
and that his borrowing "accelerated" in the fall of 2018.  PSR ¶¶ 12-13.  Although
some of the money that he borrowed prior to 2018 is included in the offense
conduct—because Mr. Parket later used it for a purpose other than that originally

Hon. Mary Kay Vyskocil                                    June 14, 2023
Re:   *United States v. Jeffrey Parket*, 22-cr-311 (MKV)      Page 5

when ███████████████████████████ and he suffered the sudden loss of
his father.  Exhibit 7, Letter of Homayoun Sasson.  These "life-shaking" events,
Exhibit 6, Letter of Anthony Bosco, "really turned him upside down emotionally,"
Exhibit 5, Letter of Victor Rousso.  Given that he lost his mother to ███████████
when he was a teenager and several other women in his family have suffered from
the disease, it was especially difficult for Mr. Parket ████████████████████████████
████████████████████████████████████████████████████████████████████████
██████████████████████ Exhibit 7, Letter of Homayoun Sasson. ███████████
*Id.*  As for his father, Mr. Parket was devastated by his death, and said the Jewish
prayer for the death of a parent every day with his sister.  Exhibit 4, Letter of
Allison Berman.

        Unable to balance his career with his ████████████ and the loss of his father,
he made some reckless investment decisions and lost essentially all of his net worth
in a very short period of time.  Exhibit 1, Letter of Jeffrey Parket.  In a desperate
and wrongful attempt to recoup his losses, he made a series of the worst decisions
that he has made in his entire life: to obtain loans from individuals and entities
based on lies about his financial condition and his reasons for needing the loans.
More specifically, he pledged fake collateral, submitted fake bank statements, and
used the identities of others to demonstrate to lenders that he was qualified for the
loans.  Mr. Parket continued to make bad investments with the funds that he raised
and, like a typical Ponzi scheme, the offense snowballed out of control.  As the loans
came due, Mr. Parket had no money to pay them, so he sought additional loans to
repay earlier lenders.

        In the winter of 2021, Mr. Parket hit rock bottom.  He realized that the way
that he had been conducting his life, the fraud he had been committing, could not
continue.  Feeling deep shame, remorse, and depression, on November 30, 2021, ████
█████████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████████
████████████ 3 ████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████████

─────────────────────────────

intended—the offense began in earnest in 2018 when he started falsifying
documents and lying to lenders about his financial condition to secure additional
loans.

─────────────────────────────

[3] There is a typo in the PSR's reference to Mr. Parket's ████████████████████
████████ which occurred in December 2021, not 2022.  PSR ¶ 69.

Hon. Mary Kay Vyskocil                                    June 14, 2023
Re:   *United States v. Jeffrey Parket*, 22-cr-311 (MKV)        Page 6



Because of ███████████, Mr. Parket began seeing a therapist in February of 2022 and more recently has been seeing an additional therapist referred to him by Pretrial Services. *Id.* ¶¶ 73-74. His first therapist, Evan Stern, who has been seeing Mr. Parket ███████████████████ and that he is "overwhelmed with shame for the crimes that he committed and the harm that he has caused others." *Id.* ¶ 73. His second therapist, Peter Turco, notes that Mr. Parket has ███████████████████

In late 2021, Mr. Parket's remorse also drove him to reach out to the victims of his offense to confess that he had lied to them and assure them that he would do everything he could to make it right. PSR ¶ 21. In particular, he emailed a number of the lenders, saying that he had "no excuses" for his actions and that he would "own up to everything" he had done. *Id.* Since then, Mr. Parket has lived in profound remorse. Although he knows that he "can never make amends for the emotional pain that [he has] inflicted on people who trusted [him]," Exhibit 1, Letter of Jeffrey Parket, he has been single-mindedly focused on compensating his victims financially and paying his debt to society more broadly.

### III.   Mr. Parket's Voluntary Confession to the Government

Shortly after Mr. Parket's ███████████, he realized that part of making amends for his wrongs involved confessing to the government and facing consequences for his crimes. Through prior counsel, he first reached out to prosecutors in the Eastern District of New York ("EDNY")—before he knew that he was under investigation of any kind—to disclose his criminal conduct and assist in his own prosecution. PSR ¶ 24. Shortly thereafter, Mr. Parket's prior counsel learned that the Southern District of New York ("SDNY") had already opened an investigation into his offense, so he was directed to speak with the SDNY instead. *Id.*

He had two proffer sessions—without the protections of a proffer agreement—with a prosecutor and an agent that lasted approximately five hours during which he confessed in full. He produced voluminous documents to the SDNY confirming his guilt, *id.*, including a lengthy written narrative that he prepared specifically to walk the government through the lies that he told to his victims and

Hon. Mary Kay Vyskocil                                          June 14, 2023
Re:   *United States v. Jeffrey Parket*, 22-cr-311 (MKV)          Page 7

what false documents he presented to each one.  Exhibit 1, Letter of Jeffrey Parket.
He continued to cooperate in his own prosecution by spending hours on video calls
with AUSA Chong and an agent with the U.S Postal Inspection Service to help
them calculate the appropriate forfeiture and restitution amounts.  *Id.*  Unlike
many defendants, Mr. Parket sought to be as inclusive as possible in the restitution
amounts,[4] intending to pay his victims in full.  He knows that no amount of money
can restore their trust in him or their relationships, but he wants to do all he can to
try to make them whole.  Although his restitution obligation is substantial by any
measure, Mr. Parket has developed a plan to earn enough money to satisfy that
obligation.

### IV.   Mr. Parket's Efforts to Repay his Victims and ███████

        In addition to disclosing his offense to the government, Mr. Parket was eager
to find a way to earn enough money to make his victims whole, even though the
task of earning almost $35 million[5] in restitution is extremely daunting.  He
discovered the SEC Whistleblower Program, which permits individuals who provide
the SEC with original information about financial wrongdoing to obtain a portion of
the SEC's recovery against those wrongdoers.[6]  It is no exaggeration to say that,
once Mr. Parket learned of the Whistleblower Program, he dedicated his entire
existence to researching and filing whistleblower cases with the SEC. ████████
████████████████████████████████████████████████████████████████
Given the magnitude of the wrongdoing that Mr. Parket has uncovered, it is quite
possible that these whistleblower cases, along with future filings, will result in
substantial if not total recovery for his victims. ███████████████████████
████████████████████████████████████████████████████████████████

---

[4] Indeed, not only did the restitution amount increase as the plea negotiation
process progressed, but his plea agreement reflects his consent to pay an additional
$200,000 in restitution beyond what is owed in connection with the offense conduct.
*See* Plea Hearing Tr. 25-27, 28.

[5] Mr. Parket has already forfeited approximately $2.4 million from a JP Morgan
Chase Account and shares in an energy company held in a retirement account, the
value of which is currently uncertain.

[6] *See generally* https://www.sec.gov/whistleblower, which contains a general
description of the SEC Whistleblower Program.

Hon. Mary Kay Vyskocil                              June 14, 2023
Re:    *United States v. Jeffrey Parket*, 22-cr-311 (MKV)          Page 8

███████████████ We have attached as Appendix B a sealed document with further detail about these whistleblower cases, including ██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████████████████████ He has filed five total cases and sixteen supplemental submissions.  Exhibit 1, Letter of Jeffrey Parket.  These detailed filings span hundreds of pages and describe civil and criminal wrongdoing by numerous sophisticated parties in the financial industry. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ His efforts are in no way designed to enrich himself.  *Id.*  The success of the cases depends on him filing supplemental submissions and monitoring the SEC's public filings to determine whether the SEC has in fact pursued claims against any of the wrongdoers.  Exhibit 1, Letter of Jeffrey Parket.  This is an enormous undertaking given the scope of the whistleblower filings and the more than 350 parties involved in his cases.  *Id.* Accordingly, his ability to repay his victims depends on his having access to these critical materials.

Filing whistleblower cases has given Mr. Parket an additional purpose in his life: the opportunity to make amends to society more broadly by rooting out financial wrongdoing and helping investors recover some of their losses.  Exhibit 1, Letter of Jeffrey Parket.  In other words, not only does he want to pay back his victims, but Mr. Parket also seeks to atone for his offense by ███████████████████████████████████ This work could enable many small retail investors to recoup some of what they have lost due to extensive financial wrongdoing.

Mr. Parket's supporters agree that he is genuinely remorseful and devoted to his desire to repay his victims.  His former wife, Robyn Parket, writes that he is

Hon. Mary Kay Vyskocil                                    June 14, 2023
Re:   *United States v. Jeffrey Parket*, 22-cr-311 (MKV)          Page 9

"working very hard to make restitution to his victims" and asks the Court for kindness in sentencing him.  Exhibit 3, Letter of Robyn Parket.  He has been "solely focused" on repaying his victims through these whistleblower cases, "put[ting] repaying his victims ahead of any potential benefit for himself."  Exhibit 2, Letter of Brett Parket.  Mr. Rousso notes that Mr. Parket has expressed "his extreme remorse and guilt," that he has been "living in solitude, with little or no money, working day and night to earn money to pay back his victims."  Exhibit 5, Letter of Victor Rousso.  Mr. Parket's "priority in life is restitution and forgiving of his friends, family, and business associates."  *Id.*  One friend sees his confession and relentless devotion to these cases as "[p]roof of [Mr. Parket's] foundational integrity," demonstrating that his "moral compass reset itself."  Exhibit 6, Letter of Anthony Bosco.  *See also* Exhibit 7, Letter of Homayoun Sasson.

     In addition to spending countless hours on his whistleblower cases, Mr. Parket has also sought to give back to the community through more traditional forms of service. When he was living in Manhattan, he volunteered for 77 hours at the Bowery Mission, a soup kitchen downtown, and has donated blood platelets more than two dozen times. *See* Exhibit 11, Record of Service at Bowery Mission and Record of Blood Donations.  In particular, he decided to give blood as often as he could because he knows how important platelets are to cancer patients because many of his family members ████████████████ died of breast cancer.  Exhibit 1, Letter of Jeffrey Parket.  More recently, he has also volunteered at the Legacy Center in Queens.  Exhibit 8, Letter of Rabbi Bryski.  Although he does not have the money to contribute financially to the Bowery Mission now, he hopes to do so in the future after repaying all of his victims and satisfying his other financial obligations. *Id.*

     His offense has caused Mr. Parket to lose everything that mattered to him. He has gone from having a successful career and financial comfort, with a loving wife and three cherished sons, to having no assets, no income, a largely estranged family, and to relying on his son to provide him with his limited living expenses. *See* PSR ¶ 88; Exhibit 5, Letter of Victor Rousso.  Since his arrest, Mr. Parket has lived in modest temporary rental units paid for by his son, *id.* ¶¶ 64-65, and has allotted $8 a day for his three meals.  Exhibit 4, Letter of Allison Berman.  He does not eat out at restaurants, go to theater, take car services, or enjoy any other luxuries.  He is devoted to living as modestly as possible and spending all of his time and energy filing whistleblower cases to earn money to repay his victims.

## V.   Procedural History

     On February 11, 2022, shortly after he confessed to the SDNY, Mr. Parket

Hon. Mary Kay Vyskocil                                    June 14, 2023
Re:  *United States v. Jeffrey Parket*, 22-cr-311 (MKV)      Page 10

was arrested on a complaint, and on June 2, 2022, the government filed a superseding information (ECF No. 12).  Over the next few months, the parties engaged in plea discussions through Mr. Parket's prior counsel.  As evidenced by his full confession without the benefit of a proffer agreement, it was always Mr. Parket's intent to plead guilty and take full responsibility for his offense, including by paying restitution to his victims.

The plea discussions took some time, however, because of issues related to the forfeiture and restitution amounts and the procedure for allocating them.  We understand that, prior to the appointment of the Federal Defenders, there were three occasions where the Court calendared change-of-plea hearings that were adjourned shortly before they were scheduled to take place, one of which we understand was adjourned due to the Court's schedule.  Two of these proceedings were scheduled and adjourned as the result of miscommunications with his prior counsel.  ECF No. 32, Conf. Tr. at 10 (Nov. 16, 2022).  It was never Mr. Parket's intent to inconvenience the Court or disrupt the process, and he sincerely apologizes for any issues that resulted.  Exhibit 1, Letter of Jeffrey Parket; Exhibit 6, Letter of Anthony Bosco.  Mr. Parket particularly regrets any inconvenience to the victims who wanted to attend the proceedings that were rescheduled and in no way meant to cause them any additional pain in this process, especially since the delay in executing a plea agreement occurred because Mr. Parket sought to ensure that it was fair to the victims who are entitled to restitution.  Exhibit 1, Letter of Jeffrey Parket; Exhibit 6, Letter of Anthony Bosco.

On February 15, 2023, Mr. Parket pled guilty pursuant to a plea agreement to one count of wire fraud (18 U.S.C. § 1343) and one count of bank fraud (18 U.S.C. § 1344).  The plea agreement contains a stipulated Guidelines range of 121-151 months based on an offense level of 32 and a criminal history category of 1, as well as approximately $65 million in forfeiture and $38 million in restitution.

## VI.   A substantial term of home detention is the appropriate sentence under Section 3553(a).

The Court has "very wide latitude to determine the proper degree of punishment for an individual offender and a particular crime."  *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (en banc).  In exercising that discretion, the Court takes as its "lodestar the parsimony clause of 18 U.S.C. § 3553(a)," which requires the Court to "'impose a sentence sufficient, but not greater than necessary to comply with' the factors set out in 18 U.S.C. § 3553(a)(2)": "proportionality, deterrence, incapacitation, and rehabilitation." *United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013).  In determining the appropriate sentence, the Court must

Hon. Mary Kay Vyskocil                                      June 14, 2023
Re:   *United States v. Jeffrey Parket*, 22-cr-311 (MKV)         Page 11

consider these purposes as well as the nature and circumstance of the offense, the
history and characteristics of the defendant, the need to avoid unwarranted
sentencing disparities, and the need to provide restitution to any victims of the
offense, among other factors. 18 U.S.C. § 3553(a)(1)-(7).

The Section 3553(a) factors favor a sentence of time served and a substantial
term of supervised release with a condition that it be served on home detention. We
recognize that our request for a substantial term of home detention at first seems
extraordinary in light of the seriousness of the offense and the stipulated Guidelines
range. But we respectfully submit that it is warranted on the unique facts of this
case, most importantly the fact that Mr. Parket's plan to repay his victims depends
on him remaining outside of prison to continue to supplement and monitor his
existing whistleblower filings and research and file new cases. Given the size of the
restitution and forfeiture judgments, he will likely need to file numerous successful
whistleblower claims to pay back his victims in full, since there is no way to predict
with precision how much he will recover from each of his cases. On the facts here,
Section 3553(a)(7)—the "need to provide restitution to any victims of the offense"—
takes on enormous weight in determining the appropriate sentence.

Several other factors warrant the significant variance that we propose. The
Guidelines, which the Second Circuit has recognized place an undue emphasis on
loss amount, fail to account for compelling mitigating factors present here. Those
mitigating factors include Mr. Parket's voluntary and full disclosure of his criminal
conduct, which occurred before he knew that he was being investigated, and
substantial assistance to the government in prosecuting him; his complete
acceptance of responsibility and expressions of remorse; his tireless efforts over the
past 18 months to earn money to repay his victims; the harsh consequences that he
has already suffered to his career, his finances, his mental health, and his family;
the non-violent nature of his offense; and his lack of recidivism risk. Probation
recognizes several of these mitigating factors in recommending a downward
variance of 84 months' imprisonment. Although Probation recommended a
downward variance, we note that Probation did not have access to the details
underlying Mr. Parket's whistleblower filings and Mr. Parket has made additional
filings and supplemental submissions since his interview with Probation.

There is no dispute that Mr. Parket stands convicted of a serious fraud
offense. But we respectfully submit that a substantial term of home detention, on
the unique facts of this case, adequately addresses the Section 3553(a) factors.

Hon. Mary Kay Vyskocil                                    June 14, 2023
Re:   *United States v. Jeffrey Parket*, 22-cr-311 (MKV)        Page 12

### A. Mr. Parket's ability to pay restitution to his victims depends on him serving his sentence in the community, with access to the internet.

In determining the appropriate sentence, the Court must consider the "need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7). "A sentencing court is empowered to consider whether the victims will receive restitution from the defendant in varying from the Sentencing Guidelines based on § 3553(a) factors." *United States v. Rangel*, 697 F.3d 795, 803 (9th Cir. 2012). That is so because the "goal of obtaining restitution for the victims of Defendant's offense . . . is better served by a non-incarcerated and employed defendant." *United States v. Menyweather*, 447 F.3d 625, 634 (9th Cir. 2006), *overruling on other grounds recognized by United States v. Munoz-Camarena*, 621 F.3d 967, 969 (9th Cir. 2010). *See also United States v. Plate*, 839 F.3d 950, 957 n.6 (11th Cir. 2016) (noting that a long prison sentence "arguably cuts *against*" Section 3553(a)(7), citing authority that a "harsh sentence may undercut the offender's ability to work in order to repay her victims"); *United States v. Coleman,* 370 F. Supp. 2d 661, 681 (S.D. Ohio 2005) (imposing a sentence of five years of probation in part because it would "afford Defendants more time to pay restitution" than a sentence of imprisonment); *United States v. Peterson*, 363 F. Supp. 2d 1060, 1062 (E.D. Wis. 2005) (imposing a sentence of one day of incarceration and five years of supervised release with conditions in part so that the defendant would be better able to repay the money that he stole); *United States v. Behrendt*, No. 08-cr-71, 2008 WL 4643380, at *3 (E.D. Wis. Oct. 20, 2008) (noting that "a sentence served in the community best served the need to make restitution identified in § 3553(a)(7)").

It is true that, in "many of the fraud cases we see here[,] there is virtually no possibility that restitution will be made." *United States v. Gajwani*, 16-cr-660 (LAP) (S.D.N.Y. Nov. 29, 2017), ECF No. 50, Sent'g Tr. at 24:3-5. But "[t]hat isn't the case here." *Id.* at 24:5, 12 (imposing a sentence of five years' probation with six months of home confinement to "allow for the maximum period of payment of restitution"). Similarly, Mr. Parket's victims and society are "better served by allowing [him] to work to pay back the victim[s] of his fraud instead of taking him away from his family, imposing further suffering on them, just for the sake of punishment." *Id.* at 24:6-9.

Mr. Parket has agreed to pay almost $38 million in restitution. PSR ¶ 26. Unlike the vast majority of defendants with such a large restitution judgment, he has a plan to pay his victims back in full by pursuing multiple whistleblower cases as well as a ██████████████████████████████████████

Hon. Mary Kay Vyskocil                                        June 14, 2023
Re:   *United States v. Jeffrey Parket*, 22-cr-311 (MKV)        Page 13

██████████████████████████        *See* Appendix B; Exhibit 1, Letter of Jeffrey Parket;
████████████████████████████████████████████████████████████        In
connection with the whistleblower cases, Mr. Parket has uncovered billions of
dollars in wrongdoing and, when the SEC collects money based on his filings, he
will receive 10-30% of the total amount collected.[8]  In 2021, 85% of the
whistleblower awards that the SEC paid were the statutory maximum of 30%.[9]

        Because he has identified billions of dollars in potential wrongdoing
already—and is continuing to research new cases—Mr. Parket could be in a position
to satisfy his restitution judgment in full after the whistleblower cases are resolved.
But, as he explains in his letter to the Court, his ability to do so depends on him
remaining outside of prison.  First, successfully pursuing whistleblower awards
requires the filing of numerous supplemental submissions to assist the government
in its investigation and encourage the government to move promptly in its inquiry.
Without access to a computer and the internet, Mr. Parket will not be able to
research and file those supplemental submissions.  Second, the SEC does not inform
the whistleblower—who is typically anonymous—when a qualifying judgment is
entered.  Instead, the whistleblower must monitor the SEC's public Notices of
Covered Actions to see if any of his filings was the basis for a collected penalty and
then apply for a whistleblower award.  In Mr. Parket's case, monitoring these
notices is time-intensive because of the number of parties that he has accused of
wrongdoing.  Again, without the ability to access a computer with an internet
connection, Mr. Parket will be unable to monitor the SEC's enforcement activities
and timely apply for an award, depriving his victims of their ability to recover.
With respect to the cases where Mr. Parket does not have counsel, this could be
especially damaging to his efforts to pay back the victims and all of Mr. Parket's



---

[8] *See* SEC Office of the Whistleblower, https://www.sec.gov/whistleblower ("The
range for awards is between 10% and 30% of the money collected.").

[9] U.S. Securities and Exchange Comm'n, *Whistleblower Program: 2021 Annual
Report to Congress* at 44 (Nov. 15, 2021),
https://www.sec.gov/files/2021_ow_ar_508.pdf.

Hon. Mary Kay Vyskocil                                    June 14, 2023
Re:     *United States v. Jeffrey Parket*, 22-cr-311 (MKV)        Page 14

efforts could end up being wasted.

There is good reason to believe that Mr. Parket's whistleblower cases have merit and could lead to a substantial recovery.



In short, "a prison sentence would harm the victim[s] by" preventing Mr. Parket from pursuing his whistleblower cases and "thus [his] ability to pay restitution," which is a "significant concern under § 3553(a)(7)." *United States v. Goss*, 325 F. Supp. 3d 932, 936 (E.D. Wis. 2018). Even where victims express "anger" that is "entirely justified," courts have considered that "imposing a lengthy prison sentence could also be counterproductive" in certain cases. *Id.* We respectfully submit that this is just such a case and that the Court should weigh this factor heavily in imposing a substantial sentence of home detention to permit Mr. Parket to continue his efforts to repay the victims of his offense.

### B. A Guidelines sentence would be excessive because it overemphasizes the loss amount and would create an unwarranted disparity.

In determining the appropriate sentence, the Court is required to consider the advisory Guidelines range but may impose a sentence below that range after considering the Section 3553(a) factors. In other words, the "Sentencing Guidelines are just that, guidelines, and . . . they are truly advisory." *Douglas*, 713 F.3d at 700 (quotation marks omitted).

While we do not dispute the Guidelines calculation in the PSR, that Guideline recommendation is excessive on the facts of Mr. Parket's case and, if imposed, would result in dramatic and unwarranted sentencing disparities. Courts have repeatedly recognized that the fraud Guideline is deeply flawed because it is driven so heavily by the loss amount and regularly find that it is entitled to less weight than other sections of the Guidelines. Unsurprisingly, then, sentencing data show that in fraud cases with high loss amounts, Guidelines sentences are the exception and substantial downward variances are the norm.

Hon. Mary Kay Vyskocil                                    June 14, 2023
Re:   *United States v. Jeffrey Parket*, 22-cr-311 (MKV)        Page 15

### 1. The Second Circuit has discredited the fraud Guideline because it overemphasizes loss amount and fails to account for other factors relevant to sentencing.

As set forth in the PSR, and consistent with the plea agreement, Mr. Parket is in Criminal History Category I (with zero prior arrests or convictions of any kind) and has a total offense level of 32.  PSR ¶¶ 45, 48-49.  The base offense level is 7 and the loss amount associated with the fraud (approximately $38 million) raises that offense level by 22 points, which amounts to a staggering increase of 314%.  Even with other enhancements,[10] the loss amount accounts for 68% of Mr. Parket's total offense level, yielding an unreasonably high Guidelines range of 121-151 months' imprisonment.

Rather than deferring to the Guidelines, the Court "must make an individualized assessment based on the facts presented" and "may not presume that the Guidelines range is reasonable."  *Gall v. United States*, 552 U.S. 38, 50 (2007).  For economic offenses, the Second Circuit has invited district courts to consider non-Guidelines sentences where the overwhelming focus on the loss amount leads to a high Guidelines recommendation: "Where the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence."  *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016).  Although there was no error in the sentence imposed in *Algahaim*, the Court remanded the case to "permit the sentencing judge to consider whether the significant effect of the loss enhancement, in relation to the low base offense level, should result in a non-Guidelines sentence."  *Id.*  The loss amount at issue increased the offense level from 6 to 18 for one defendant and from 6 to 16 for another.  *Id.* at 799.  The increase attributable to loss amount in this case dwarfs those numbers, adding 22 levels to Mr. Parket's base offense level of 7.  Accordingly, the concerns that the Circuit expressed in *Algahaim* about Section 2B1.1's overemphasis on loss amount apply even more strongly here.  *See also United States v. Corsey*, 723 F.3d 366, 380 (2d Cir. 2013), *as corrected* (July 24, 2013) (Underhill, J., concurring) (writing that the "loss guideline is fundamentally flawed, especially as loss amounts climb.  The higher the loss amount, the more distorted is the guideline's advice to sentencing judges").

---

[10] Other enhancements include the involvement of 10 or more victims or causing substantial financial hardship (2 levels), the use of sophisticated means (2 levels), and the possession of an authentication feature (2 levels).  PSR ¶¶ 35-37.  The adjusted offense level of 32 also accounts for a three-point reduction for acceptance of responsibility.  *Id.* ¶¶ 43-44.

Hon. Mary Kay Vyskocil                                    June 14, 2023
Re:    *United States v. Jeffrey Parket*, 22-cr-311 (MKV)          Page 16

The seemingly random increases in offense level illustrate the illogic of the loss table.  For example, a fraud that involved more than $6,500 increases the offense level by 2 points, while a loss of over $15,000 increases it by 4 points, meaning that an $8,500 increase adds 2 additional points to the offense level.  The next 2-point increase comes only after the fraud causes a loss greater than $40,000.  An $8,500 difference in loss amount therefore has the same incremental impact as a $25,000 difference. The illogic becomes even more apparent with higher loss amounts.  The difference between a scheme involving a loss amount of $6,500.01 and one involving a loss amount of $15,000.01 is 2 points.  Similarly, the difference between a fraud involving $25,000,000.01 and $65,000,000.01 is 2 points, as is the difference between a scheme involving a loss amount of $250,000,000.01 and one involving a loss amount of $550,000,000.01.  Therefore, a spread of $8,500, a spread of $40 million, and a spread of $300 million each have an identical impact on the offense level calculation.  Mr. Parket's loss amount is $38 million.  In order to make his offense level increase proportionate to the 30-level increase that applies to a fraud of $550 million or more, the incremental increase to his offense level should be 2, not 22.[11]

Given this arbitrary construction, it is unsurprising that Courts in this Circuit have expressed concern about Guidelines increases attributable to loss amount and varied downward substantially because of that concern.  For example, Judge Rakoff has noted: "By making a Guidelines sentence turn, for all practical purposes, on this single factor, the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, . . . and, by contrast, effectively guaranteed that many such sentences would be irrational on their face."  *United States* v. *Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012).  Numerous other judges have expressed the same sentiment:

- "The Guidelines place undue weight on the amount of loss involved in the fraud. This is certainly a relevant sentencing factor: All else being equal, large thefts damage society more than small ones, create a greater temptation for potential offenders, and thus generally require greater deterrence and more serious punishment. But the guidelines provisions for theft and fraud place excessive weight on this single factor, attempting—no doubt in an effort to fit the infinite variations on the theme of greed into a limited set of narrow sentencing boxes—to assign precise weights to the theft of different dollar amounts. In many cases, including this one, the amount

---

[11] $38,000,000 is 6.9% of $550,000,000.  For Mr. Parket's offense level increase to be proportional, it should be 6.9% of the 30-level increase that applies to a fraud of $550,000,000, which is 2.07.

stolen is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence." *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (Lynch, J.)

- "The concerns I have with the rapid acceleration in the [Guidelines] enhancement levels are not solitary. [A] number of distinguished colleagues have expressed doubts concerning the application of a guidelines sentence for economic crimes involving large losses. . . . Sentencing has to be more than selecting a number of months based on where the X and Y coordinates in the sentencing table happen to cross." *United States v. Levy*, No. 11-cr-62 (PAC) (S.D.N.Y. Feb. 19, 2014), ECF No. 371, Sent'g Tr. 24:1-5, 25:12-14 (Crotty, J.).

- "There is certainly no secret, as well, that I subscribe to the views of a whole host of judges . . . that the guidelines . . . are just mindlessly accelerated once you have numbers of any size in the loss or gain table. . . . [I]t is the tail of the dog wags everything else. This mindless acceleration essentially makes the guideline for economic crimes, in my view, almost useless . . ." *United States v. Faibish*, No. 12-cr-265 (E.D.N.Y. Mar. 10, 2016), ECF No. 271, Sent'g Tr. 23:1-12 (Vitaliano, J.)

- "[T]he Sentencing Commission's loss-enhancement numbers do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime. . . . Given the feeble underpinnings of the loss enhancement, it is particularly galling that this factor is often more or less *solely* responsible for a white-collar offender's Guidelines sentence. . . . That this situation continues unabated is a great shame for the many offenders sentenced under this Guideline who do not receive a sentence that makes any sense for the actual crime of conviction." *United States v. Johnson*, No. 16-cr-457-1 (NGG), 2018 WL 1997975, at *3, *4 (E.D.N.Y. Apr. 27, 2018) (considering a loss enhancement of 16 levels, varying from a Guidelines range of 87-108 months to impose a sentence of 24 months' imprisonment).

These concerns apply with even greater force due to the unique facts of Mr. Parket's case. As explained above, any term of incarceration, let alone a Guidelines sentence, would virtually eviscerate Mr. Parket's ability to repay his victims. It also fails to account for the other Section 3553(a) factors, each of which favors a substantial sentence of home confinement.

Hon. Mary Kay Vyskocil      June 14, 2023
Re: *United States v. Jeffrey Parket*, 22-cr-311 (MKV)   Page 18

### 2. Sentencing data demonstrate that a substantial downward variance is necessary to avoid unwarranted sentencing disparities under Section 3553(a)(6).

The Court is required to consider "the need to avoid unwarranted sentence disparities" among similarly situated defendants.  18 U.S.C. § 3553(a)(6).  Although the "primary purpose" behind Section 3553(a)(6) is to eliminate national sentencing disparities, the statute "does not on its face restrict the kinds of disparity a court may consider" in weighing this factor.  *United States v. Wills*, 476 F.3d 103, 109 (2d Cir. 2007) *abrogated on other grounds by Kimbrough v. United States*, 552 U.S. 85 (2007); *see also United States v. Fernandez*, 648 F. App'x 56, 62 (2d Cir. 2016) (summary order) (noting that "a district court may consider case-specific disparities").

In considering whether a sentence creates an unwarranted disparity, "[s]tatistics from the Sentencing Commission . . . which [are] readily available to the district court at the time of sentencing" may provide helpful guidance and allow for a "meaningful comparison."  *United States v. Jenkins*, 854 F.3d 181, 193 (2d Cir. 2017) (analyzing median and mean sentences for child pornography offenders).  The Second Circuit has noted that, in child pornography cases, a Guidelines sentence can create unwarranted sentence disparities because courts "routinely impose[] lower sentences for child pornography offenses," *id.* at 193 n.6, meaning that Guidelines sentences are in fact the outliers.  Accordingly, robust data can help determine whether a Guidelines sentence would create an unwarranted sentencing disparity, as it would in this case.

A specific analysis of the sentences actually imposed on defendants under a specific Guideline, and in a particular offense level and criminal history category, permits precisely the kind of meaningful comparison that the Second Circuit contemplated in *Jenkins*.  That is what Professor Crystal S. Yang has provided in her declaration, attached as Exhibit 12, which includes a comprehensive picture of average and median sentences imposed on defendants who are similarly situated to Mr. Parket.  More specifically, Professor Yang compiled Sentencing Commission data for the years 2006 through 2021 and analyzed summary statistics nationally, in this District, and for all districts in the Second Circuit.  Exhibit 12, Decl. of Crystal Yang, Ph.D., ¶ 6.  Professor Yang was able to discern the median prison sentences imposed on defendants who, like Mr. Parket, were sentenced under Section 2B1.1 with an offense level of 32 and a criminal history category of I.  Table I, pictured below, summarizes Professor Yang's findings:

Hon. Mary Kay Vyskocil                                    June 14, 2023
Re:   *United States v. Jeffrey Parket*, 22-cr-311 (MKV)       Page 19

Table 1.  Sentences in Months for USSG §2B1.1, Criminal History I, Offense Level 32, 2006-2021: Cooperators vs. All Defendants vs. Non-Cooperators. [N=410].

|  | Cooperators | All Defendants | Non-Cooperators |
|---|---|---|---|
| **S.D.N.Y.** | Avg Time = 19.17<br>25th Percentile = 0.00<br>Median = 0.03<br>75th Percentile = 34.79<br>[N = 11]<br>min: 0 max: 120.0 SD: 37.33 | Avg Time = 51.57<br>25th Percentile = 0.03<br>Median = 39.00<br>75th Percentile = 96.00<br>[N = 26]<br>min: 0 max: 121.0 SD: 45.6123 | Avg Time = 75.33<br>25th Percentile = 36.00<br>Median = 72.00<br>75th Percentile = 110.00<br>[N = 15]<br>min: 24.00 max: 121.0 SD: 35.9159 |
| **2ᵈ Circuit** | Avg Time = 20.62<br>25th Percentile = 0.03<br>Median = 3.00<br>75th Percentile = 23.41<br>[N = 24]<br>min: 0 max: 120.0 SD: 36.39 | Avg Time = 43.45<br>25th Percentile = 3.00<br>Median = 36.00<br>75th Percentile = 72.00<br>[N = 47]<br>min: 0 max: 151.0 SD: 44.80 | Avg Time = 67.26<br>25th Percentile = 36.00<br>Median = 60.00<br>75th Percentile = 100.00<br>[N = 23]<br>min: 0 max: 151.0 SD: 40.6283 |
| **National** | Avg Time = 47.15<br>25th Percentile = 12.03<br>Median = 48.00<br>75th Percentile = 76.00<br>[N = 104]<br>min: 0 max: 120.0 SD: 34.18 | Avg Time = 85.72<br>25th Percentile = 60.00<br>Median = 84.00<br>75th Percentile = 121.00<br>[N = 410]<br>min: 0 max: 360.0 SD: 46.26 | Avg Time = 98.83<br>25th Percentile = 68.00<br>Median = 97.00<br>75th Percentile = 121.00<br>[N = 306]<br>min: 0 max: 360.0 SD: 42.3776 |

Table 1 demonstrates that substantially below Guidelines sentences are the norm nationally and in this Circuit.  For non-cooperating defendants, the median sentence in the Second Circuit is 60 months, approximately half of the bottom of the Guideline range.  In other words, half of the non-cooperating defendants in this Circuit with Mr. Parket's Guideline and criminal history category receive a sentence of less than five years.  The national statistics also demonstrate a trend toward significant variances, with a median sentence of 97 months' imprisonment.

When one considers cooperators and non-cooperators together, the Second Circuit median drops to 36 months, and the national median drops to 84 months, which is Probation's recommendation in this case, and one-third of all defendants nationally receive a sentence of 60 months or less.  Exhibit 12, Decl. of Prof. Yang, Figure 1.2.  As for cooperators only, the median sentence in the Southern District of New York is 0.03 months, which is how the Sentencing Commission reports sentences of time served, and the median sentence in the Second Circuit is 3 months.  *Id.* Figure 1.1.  Even nationally, the data demonstrate that a substantial downward variance for cooperators is the norm: the median sentence nationally for cooperators is 48 months, and the 25th percentile is slightly over a year.

The sentences imposed on cooperators are especially instructive in this case because, although he does not have a formal cooperation agreement with the government, Mr. Parket is more like a government cooperator than an ordinary defendant.  First, like a cooperator, Mr. Parket confessed all of his crimes to the

government and otherwise assisted the government in his own prosecution.  Indeed, his actions are even more impressive and worthy of recognition than a standard cooperator who typically only begins cooperating after he or she is indicted or learns that he or she is the target of an investigation.  Here, Mr. Parket did not wait to hear that he was in criminal jeopardy before voluntarily confessing, providing documentation of his offense, and working with the government on the applicable restitution figures.  Any sentence imposed should recognize that extraordinary act.



A sentence of time served with a substantial term of supervised release to be served on home detention is consistent with sentences imposed on cooperators in this District and Circuit who share Mr. Parket's Guideline range of 121-151 months. Exhibit 12, Decl. of Prof. Crystal Yang, Tbl. 1.  Accordingly, unlike a Guidelines sentence, the sentence that we request adequately recognizes Mr. Parket's post-offense conduct and would not create an unwarranted sentencing disparity.  Indeed, in 2022, 23.3% of defendants convicted of fraud, theft, or embezzlement received a sentence of probation, and 5.5% received probation with additional conditions such as home detention.[12]  According to those data as well as the Circuit-wide data on cooperators, there is ample precedent for the sentence that we request.

---

[12] U.S. Sent'g Comm'n, *FY 2022 Sourcebook of Federal Sentencing Statistics*, Tbl. 13, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2022/Table13.pdf.

Hon. Mary Kay Vyskocil                                    June 14, 2023
Re:   *United States v. Jeffrey Parket*, 22-cr-311 (MKV)        Page 21

### C.  A substantial term of home detention adequately punishes and deters Mr. Parket by capturing the seriousness of his offense as well as his personal history and characteristics.

Section 3553(a) requires the Court to consider the sentence's ability to provide just punishment and address the seriousness of the offense while also considering the history and characteristics of the defendant.  18 U.S.C. § 3553(a)(1), (2)(A), (B).  In other words, as the Supreme Court has recognized, "the punishment should fit the offender and not merely the crime."  *Pepper v. United States*, 562 U.S. 476, 487-88 (2011) (quotation marks omitted).

A substantial term of home detention, although less punishing than incarceration in prison, still constitutes a serious penalty. The Supreme Court has explained that supervised release—even without a condition of home detention— constitutes a "substantial restriction of freedom" for a defendant.  *Gall*, 552 U.S. at 48.  Defendants on probation or supervised release are "subject to several standard conditions that substantially restrict their liberty" and may have additional special conditions that further restrain them.  *Id.*  Therefore, the Second Circuit has noted that "supervised release is itself a serious sanction that imposes significant limitations on a defendant's liberty."  *United States v. Brooks*, 889 F.3d 95, 101 (2d Cir. 2018).  Further, "[s]upervised release is tantamount to probation, and the courts . . . have recognized that probation is both rehabilitative and punitive."  *United States v. Collado*, No. 07-cr-1144 (HB), 2008 WL 2329275, at *6 (S.D.N.Y. June 5, 2008).  In sum, supervised release—especially with a condition of home detention—"is not an act of leniency."  *Id.*

Moreover, the Sentencing Guidelines recognize that "[h]ome detention may be imposed as a condition of probation or supervised release, but only as a substitute for imprisonment."  Guidelines § 5F1.2.  By recognizing that home detention can be a substitute for prison, the Sentencing Commission implicitly acknowledges its punitive nature.  The Guidelines' definition of home detention reveals how restrictive it is in practice:

> "*Home detention*" means a program of confinement and supervision that restricts the defendant to his place of residence continuously, except for authorized absences, enforced by appropriate means of surveillance by the probation office. When an order of home detention is imposed, the defendant is required to be in his place of residence at all times except for approved absences for gainful employment, community service, religious

Hon. Mary Kay Vyskocil                                    June 14, 2023
Re:   *United States v. Jeffrey Parket*, 22-cr-311 (MKV)         Page 22

> services, medical care, educational or training programs,
> and such other times as may be specifically authorized.
> Electronic monitoring is an appropriate means of
> surveillance for home detention. However, alternative
> means of surveillance may be used if appropriate.

Guidelines § 5F1.2, Application Note 1. It is within the Court's discretion to
"impose other conditions . . . appropriate to effectuate home detention," including by
"limit[ing] the amenities available" at home. *Id.* Application Note 2; *see United
States v. Bello*, 310 F.3d 56, 63 (2d Cir. 2002). Any ordinary citizen would find a
substantial term of home detention extremely burdensome and recognize it as
punishment. Balanced against Mr. Parket's personal history and characteristics, a
sentence of home detention adequately addresses the seriousness of his offense
while also protecting his victims by providing them with a greater chance of being
repaid due to his whistleblower cases.

        Mr. Parket has also suffered numerous collateral punishments because of his
offense. "It is difficult to see how a court can properly calibrate a 'just punishment'
if it does not consider the collateral effects of a particular sentence" on the
defendant. *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009). The Second
Circuit has therefore "embrace[d] . . . collateral consequences as bearing on the
concept of 'just punishment.'" *United States v. Nesbeth*, 188 F. Supp. 3d 179, 187
(E.D.N.Y. 2016).

        Mr. Parket has experienced such consequences in spades. Most importantly,
Mr. Parket's offense has caused many of his family members to cease
communicating with him. Where before he had a loving wife and three sons with
whom he shared a close relationship, he now only has one son who still speaks to
him and his wife has divorced him. He understands that he betrayed their trust
and he will forever be punished for his choice to lie to his family members and close
friends, a fact that the Court should consider in imposing sentence. Not only that,
but he has lost all of his assets, his career, and his ability to earn a substantial
income at conventional employment. His felony conviction is public, and a quick
Google search of his name will forever brand him as a felon, virtually guaranteeing
that no one will do business with him ever again.

Hon. Mary Kay Vyskocil                                          June 14, 2023
Re:   *United States v. Jeffrey Parket*, 22-cr-311 (MKV)        Page 23

███████████████████████████████████████████████   Courts regularly consider the punitive nature of such
collateral consequences when determining the appropriate punishment. *See, e.g.*,
*United States v. Chow*, No. 17-cr-667 (S.D.N.Y. Jan. 17, 2019), ECF No. 161, Sent'g
Tr. at 82:17-24 (imposing a substantial downward variance in part "given the many
adverse collateral consequences that [the defendant] already has suffered,"
including the loss of his job, a bar from the securities industry, and the prospect of
further civil litigation).

        Regarding his personal history and characteristics: this is Mr. Parket's first
criminal offense of any kind.  For the first 55 years of his life, he was a law-abiding
citizen who sought to follow all the rules.  *See* Exhibit 4, Letter of Allison Berman.
This offense was a complete aberration for him, such that those who know him best,
including his sister, his son, and close friends, still have a hard time reconciling the
Mr. Parket that they know with the person who could have committed such a
serious fraud offense.  Although it is not an excuse for his actions, the traumatic
loss of his father ████████████████████████████ sent him into a tailspin,
causing him to incur massive investment losses.  Desperate and unable to figure out
how to address his situation, Mr. Parket made the senseless and ruinous decision to
seek loans based on false documentation and other lies.  Once he started, like many
Ponzi schemes, he could not stop, since as loans came due, he needed to seek
additional financing to pay earlier lenders.  Again, none of this is an excuse for his
behavior, but it is important for the Court to consider this context in evaluating Mr.
Parket's life and character.

        As described at length above, Mr. Parket's post-offense conduct also merits
weighty consideration when evaluating his character.  Unable to live with himself,
he plunged into a deep depression, called several of his victims to tell them that he
had lied to them, and then cooperated in his own prosecution after voluntarily
agreeing to confess to his crimes before he knew that he was under investigation.
His extensive cooperation with the government "demonstrates a willingness to help
law enforcement and reduces the need for rehabilitation and deterrence" that might
ordinarily justify a prison sentence. *Stewart*, 590 F.3d at 141.  Further, he has used
his time on pretrial release not to enjoy leisure activities, but to engage in his



Hon. Mary Kay Vyskocil                                June 14, 2023
Re:    *United States v. Jeffrey Parket*, 22-cr-311 (MKV)        Page 24

single-minded pursuit of paying restitution to his victims, ███████████████ ████████████████████████████████████ and engaging in meaningful community service.  These facts demonstrate that he is more than the person who committed the offense for which he is being sentenced, and the person who he was for the first 55 years of his life—the pillar of integrity for his family and friends—is his authentic self.  "[I]f ever a man is to receive credit for the good he has done, and his immediate conduct assessed in the context of his overall life hitherto, it should be at the moment of sentencing, when his very future hangs in the balance." *United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006).  "This elementary principle of weighing the good with the bad, which is basic to all great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider . . . the 'history and characteristics of the defendant.'"  *Id.* at 514.  An appropriate balance of these factors favors a substantial sentence of home detention.

### D. A substantial term of home detention is sufficient to protect the public and promote respect for the law.

Section 3553(a) requires the Court to consider the sufficiency of the sentence imposed to protect the public, promote respect for the law, and afford adequate deterrence.  18 U.S.C. § 3553(a)(2).  A sentence of supervised release with a substantial term of home confinement is sufficient, but not greater than necessary, to serve each of these purposes.

### 1. Mr. Parket poses no recidivism risk, and a sentence of imprisonment is not required to ensure that he never reoffends again.

Mr. Parket poses no risk to society for myriad reasons that individually and in combination demonstrate that he will never commit another crime.  Those reasons include: he has no criminal history, he is 60 years old, he is highly educated, he has never abused drugs or alcohol, he has cooperated in his own prosecution ██████████████████████████, and he has demonstrated complete remorse and dedication to repaying the victims of his offense.

As the Sentencing Commission and the Guidelines have noted, "first offenders are less culpable and less likely to re-offend." U.S. Sent'g Comm'n, *Recidivism and the "First Offender"* at 1, 9 (May 2004).[14]  Multiple Sentencing

_____

[14] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf.

Hon. Mary Kay Vyskocil                                    June 14, 2023
Re:    *United States v. Jeffrey Parket*, 22-cr-311 (MKV)          Page 25

Commission studies support that view and have proven that first offenders, like Mr. Parket, with zero criminal history points are in a unique category of defendant for sentencing purposes—one which is least in need of incarceration to prevent rearrest or reconviction. A 2004 study concluded that "offenders with zero criminal history points have a primary recidivism rate of 11.7 percent . . . substantially lower than the recidivism rates for offenders with only one criminal history point." *Id.* at 13. Follow-up studies in 2017 and 2021 confirmed that offenders with zero criminal history points continue to have the lowest rates of recidivism. *See* U.S. Sent'g Comm'n, *Recidivism of Federal Offenders Released in 2010*, at 26 (Sept. 2021);[15] U.S. Sent'g Comm'n, *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders*, at 6–7 (Mar. 2017).[16] Further, first-time offenders who, like Mr. Parket, have never even been arrested before "are easily the most empirically identifiable group of guideline federal offenders who are the least likely to re-offend." U.S. Sent'g Comm'n, *Recidivism and the "First Offender"* at 17 (2004).[17]

Mr. Parket's minimal risk of reoffending is even lower when one considers his other characteristics. First, "widely available, definitive research demonstrat[es] that recidivism substantially decreases with age." *Jenkins*, 854 F.3d at 192. Multiple studies by the Sentencing Commission have concluded that "[o]lder offenders were substantially less likely than younger offenders to recidivate." U.S. Sent'g Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders*, at 3 (Dec. 2017).[18] The Sentencing Commission has explained that "[a]ge and criminal history are consistently strong predictors of recidivism," and that "[t]he combined impact of age and criminal history on recidivism is more pronounced." U.S. Sent'g Comm'n, *Recidivism of Federal Offenders Released in 2010* at 24 (Sept. 2021).[19] The data bear this out, with multiple Sentencing Commission reports concluding that "offenders aged 60 and older at release and in CHC I had the lowest rearrest rate." *Id.* at 29. The numbers are especially impressive when compared to younger offenders with substantial criminal histories: In the eight-year period of the study, "100 percent of offenders who were younger than 21 at the time of release and in

---

[15] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210930_Recidivism.pdf

[16] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf

[17] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf

[18] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf

[19] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210930_Recidivism.pdf

Hon. Mary Kay Vyskocil                                    June 14, 2023
Re:    *United States v. Jeffrey Parket*, 22-cr-311 (MKV)        Page 26

CHC IV, V, and VI . . . were rearrested.  In contrast, only 9.4 percent of offenders in
CHC I . . . who were aged 60 and older at release were rearrested."  *Id.* at 5.  Based
on his lack of criminal history and his age, Mr. Parket presents a very low risk of
rearrest, let alone re-conviction.

        Other characteristics further reduce Mr. Parket's risk of recidivism.  He is
highly educated, which, according to the Sentencing Commission, reduces his risk of
being arrested again.  U.S. Sent'g Comm'n, *The Effects of Aging on Recidivism
Among Federal Offenders* at 3 (Dec. 2017).[20]  Further still, the Sentencing
Commission has reported that "offenders sentenced for fraud, theft, or
embezzlement" had the "lowest rearrest rate[.]"  U.S. Sent'g Comm'n, *Recidivism of
Federal Offenders Released in 2010* at 5 (Sept. 2021).[21]  Taking into account Mr.
Parket's advanced age in conjunction with his offense type, his recidivism risk is
reduced even further.  Sentencing Commission data confirm that fraud-related
defendants who are more than 60 years old at release present the lowest risk of
recidivism in terms of rearrest, reincarceration, and reconviction.  U.S. Sent'g
Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders* at A-41 (Dec.
2017) (table of recidivism rates by primary offense type and age at release).[22]  And
finally, according to the Sentencing Commission, the fact that Mr. Parket was
previously legally married (even though he will soon be divorced) and has no history
of illicit drug use further demonstrates his low risk of recidivism.  U.S. Sent'g
Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal
Sentencing Guidelines* at 29 (May 2004).[23]

        Other aspects of Mr. Parket's character that are less easily measured make it
plain that Mr. Parket has learned his lesson and will not commit another crime.  As
explained at length above, his sincere remorse, voluntary confession, and
willingness to assist the government in his own case as well as in the whistleblower
cases demonstrate that he has reformed.  *See Stewart*, 590 F.3d at 141.  Further, as
a result of his choices, Mr. Parket's reputation is ruined by the public nature of his
prosecution.  He will not be in a position to borrow money again, since a perfunctory
internet search will reveal his offenses and render him undesirable to possible

---

[20] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf
[21] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210930_Recidivism.pdf
[22] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf
[23] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf

Hon. Mary Kay Vyskocil                                   June 14, 2023
Re:   *United States v. Jeffrey Parket*, 22-cr-311 (MKV)          Page 27

lenders.  He will also be a pariah in the financial industry and will not be given
authority over significant financial decisions or transactions.  *See United States v.
Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993), *aff'd,* 31 F.3d 73 (2d Cir. 1994)
(noting that the "destruction of the defendant's business" achieved certain of the
objectives of sentencing, including eliminating his "ability to engage in similar or
related activities").

       In sum, a prison sentence is not necessary to protect the public from Mr.
Parket.  All of his personal characteristics demonstrate that he has no risk of
recidivism and will never reoffend again.

### 2.   A substantial term of home detention promotes respect for the law and affords adequate general deterrence.

       A substantial term of home detention sends a powerful message: that,
although serious offenses require punishment, the Court (1) recognizes the
importance of voluntary disclosure of a person's offense ███████████████████
███████████ ; and (2) values ameliorating the harm to victims by permitting
defendants to pay restitution more than the retribution of a prison sentence.

       As important as it is to provide general deterrence through punishment, it is
equally important for a sentence to recognize positive aspects of a defendant's
character in order to encourage others to act similarly.  For example, Mr. Parket's
voluntary confession and assistance in his own prosecution—initiated before he
knew that he was under investigation—is conduct that should be strongly
encouraged.  The United States Attorneys for the Southern and Eastern Districts of
New York have recognized this principle by enacting a policy granting leniency to
corporations that voluntarily self-disclose criminal conduct.  U.S. Atty's Office,
SDNY, *Damian Williams And Breon Peace Announce New Voluntary Self-Disclosure
Policy For United States Attorney's Offices* (Feb. 22, 2023).[24]  A "goal of the policy is
. . . to incentivize companies to . . . expeditiously and voluntarily disclose and
remediate misconduct, and cooperate fully in corporate criminal investigations."  *Id.*
Under the policy, if a corporation discloses "all relevant facts known to the company
about the misconduct to a USAO in a timely fashion prior to an imminent threat of
disclosure or government investigation," the company may "receive significant
benefits," including that the government "will not seek a guilty plea" or "may choose
not to impose any criminal penalty" at all.  *Id.*  The government plainly values

---

[24] https://www.justice.gov/usao-sdny/pr/damian-williams-and-breon-peace-
announce-new-voluntary-self-disclosure-policy-united

corporate voluntary disclosure, and the Court should assign that same value to Mr. Parket's voluntary confession although he is a natural person.



Perhaps most importantly, a sentence of home detention demonstrates that the Court places great value on a defendant's work to repay his victims. Through creativity, financial knowledge, and pure grit, Mr. Parket has put in motion a plan to earn the money necessary to repay his victims (and hopefully even more to satisfy his other financial obligations as well). A sentence that constitutes a substantial restraint on his liberty but permits him to pursue his whistleblower cases sends a powerful message that the Court rewards those who figure out a way to pay restitution, even when the size of the obligation makes it seem impossible.

Separately, courts routinely recognize that collateral consequences such as loss of career, reputation, income, and assets are sources of general deterrence that merit consideration in imposing sentence. *See, e.g., United States v. Schulman,* No. 16-cr-442 (E.D.N.Y. Sept. 26, 2017) (Azrack, J.), ECF No. 155, Sent'g Tr. at 39:15-18 ("I believe that the significant collateral effects of the defendant's conviction, including his likely disbarment, have already achieved the goal of deterrence."); *Gaind,* 829 F. Supp. at 671 (loss of defendant's business, assets, and income "constitutes a source of both individual and general deterrence"); *United States v. Collins,* No. 07-cr-1170 (S.D.N.Y. July 15, 2013) (Preska, J.), ECF No. 244, Sent'g Tr. at 32:17-33:1 (explaining that where defendant was a lawyer who had lost his

Hon. Mary Kay Vyskocil                                          June 14, 2023
Re:    *United States v. Jeffrey Parket*, 22-cr-311 (MKV)        Page 29

standing in the community and his ability to make a living, "a lengthy prison
sentence is not necessary for general deterrence of similarly situated individuals
tempted to commit similar crimes particularly in light of the collateral
consequences suffered" by the defendant).  Mr. Parket will forever carry the stigma
of a felony conviction and the fact that his offense ruined his career and reputation,
and the extreme losses that he has incurred will serve as a powerful deterrent to
others.

        Moreover, "there is overwhelming evidence in the scientific literature that
the *certainty* of being caught is a vastly more powerful deterrent than the severity of
the punishment." *United States v. Browning*, 2021 WL 795725, at \*5 (E.D. Mich.
Mar. 2, 2021) (quotation marks and alterations omitted); *see United States v.
Lawrence*, 254 F. Supp. 3d 441, 444 (E.D.N.Y. 2017) (referring to expert testimony
that "[m]ost of the studies agree that there is very little deterrent effect associated
with lengthy [] punishment"). At bottom, general deterrence is served by making
arrests and convicting defendants of crimes that, regardless of jail sentences, cause
severe and debilitating real-life consequences.  A sentence of imprisonment is
therefore not required to achieve general deterrence, especially in light of the
positive message that the Court would send by recognizing Mr. Parket's post-offense
conduct.

        **E. A sentence of a substantial term of home detention is necessary
        to provide Mr. Parket with adequate mental health treatment.**

        Section 3553(a)(2)(D) requires the Court to consider the "need for the
sentence imposed . . . to provide the defendant with needed . . . medical care, or
other correctional treatment in the most effective manner."   In connection with this
factor, the Court "must weigh" Mr. Parket's "special need for extended mental
health treatment" in determining the appropriate sentence. *United States v.
Melendez*, No. 04-cr-424-03 (RWS), 2005 WL 1423268, at \*8 (S.D.N.Y. June 15,
2005).  Where a defendant has a need for "mental health counseling," this factor
favors a variance to "fulfill the rehabilitative goal of punishment and sentencing."
*United States v. Harding*, No. 05-cr-1285-02(RWS), 2006 WL 2850261, at \*5
(S.D.N.Y. Sept. 28, 2006); *see United States v. Avilez*, No. 02-cr-999 (FB), 2005 WL
1660621, at \*6 (E.D.N.Y. July 12, 2005) (imposing a sentence of three years'
probation with one year at a halfway house in part due to the mental health
treatment that would be available).

Hon. Mary Kay Vyskocil                                      June 14, 2023
Re:    *United States v. Jeffrey Parket*, 22-cr-311 (MKV)        Page 30



BOP facilities are ill-equipped to provide such comprehensive and frequent care, meaning that Mr. Parket's mental health will almost certainly deteriorate if he is incarcerated.  According to a recent report form the Bureau of Justice Statistics, only 17% of federal prisoners "who had a history of a mental health problem reported they were receiving counseling or therapy from a trained professional."  Bureau of Justice Statistics, *Indicators of Mental Health Problems Reported by Prisoners* at 2 (June 2021).[25]  Further, only 42% of federal inmates "who met the threshold for past 30-day [serious psychological distress] reported they had received mental health treatment at some time since admission," and "[a]mong those with a history of a mental health problem," only "58% of federal prisoners reported receiving treatment since admission."  *Id.  See* Marshall Project, *Treatment Denied: The Mental Health Crisis in Federal Prisons* (Nov. 21, 2018)[26] ("Although only a small fraction of federal inmates are deemed ill enough to merit regular therapy, officials acknowledged that 23 percent have been diagnosed with some mental illness.").  Not only that, but Mr. Parket would have to start over with a new therapist (if one is available) when he has already built strong relationships with his current care team.

His support in the community goes beyond his mental health care providers. The Aleph Institute, a Jewish faith-based organization that works closely with criminal defendants and their families, has been working with Mr. Parket for several months.  Exhibit 8, Letter of Rabbi Bryski.  The Aleph Institute has a wide-ranging mission that includes "advocat[ing] for alternative sentences for individuals in whom [they] detect a deep sincerity and a genuine willingness to make positive changes in their lives," and who pass a "rigorous screening process."  *Id.*  The Aleph Institute has given and will continue to give Mr. Parket a great deal of support both during his sentence and after.  For example, they will ensure that he continues to

---

[25] https://bjs.ojp.gov/sites/g/files/xyckuh236/files/media/document/imhprpspi16st.pdf
[26] https://www.themarshallproject.org/2018/11/21/treatment-denied-the-mental-health-crisis-in-federal-prisons?ref=hp-1-100

Hon. Mary Kay Vyskocil                                          June 14, 2023
Re:   *United States v. Jeffrey Parket*, 22-cr-311 (MKV)         Page 31

perform community service (if permitted), provide him with food as needed, and engage with him in extensive spiritual counseling. *Id.* A sentence of incarceration would disrupt their positive influence in his life.

Accordingly, this Section 3553(a)(2)(D) factor further supports a substantial sentence of home detention, which not only will punish Mr. Parket and ensure that he can continue to work to make restitution, but will permit him access to the kind of mental health care that has been critically important for the last 18 months.

**VII.      Conclusion**

Mr. Parket humbly comes before the Court in deep remorse and shame. He committed a serious fraud offense that hurt many people and institutions and as a result has lost everything that mattered to him. He will forever live with regret for the pain that he has caused to his victims and his family. While he knows that he deserves punishment, we respectfully request that, on the unique facts of this case, the Court weigh heavily his extensive efforts to repay his victims, his voluntary confession and cooperation in his own prosecution, his otherwise law-abiding life, his lack of risk of recidivism, his challenging mental health circumstances, and the punitive nature of home detention in imposing a substantial term of supervised release to be served on home detention. Any term of incarceration would at best delay and at worst destroy his ability to repay his victims.

We thank the Court for its consideration of this request.

Respectfully submitted,

*/s/ Lise Rahdert*

Amy Gallicchio
Lise Rahdert
Federal Defenders of New York
*Counsel for Jeffrey Parket*

Cc: All counsel of record via ECF