# Exhibit 1

June 11, 2023

Judge Vyskocil,

For a few years I fabricated documents and I lied to people. I know the difference between right and wrong and have no justification for my actions. I hurt the people that I care the most about in life. I make no excuses for the way I treated my family, my friends, and lenders that I came to know over the past few years. I can never make amends for the emotional pain that I have inflicted on people who trusted me. None of them deserved to be treated this way. I would give anything to have conducted myself differently.

I have lived three very different lives. For my first 55 years I was a model citizen. I followed the laws of our country. Previously, my most serious legal infraction was a speeding ticket more than 35 years ago. I have never smoked a cigarette, I rarely drank alcohol, and I never tried marijuana or any other illegal drug. For many years I contributed to charities where my gifts went specifically to help people in need rather than the infrastructure of the institutions. I believe that I voted in every presidential and midterm election and always served jury duty when called upon. But then, in 2018, my life as I knew it fell apart in unfathomable ways and I made horrific decisions. In a matter of weeks ██ ████████████████████████████████████████████████ and my father, with whom I was incredibly close unexpectedly passed away. I acted irrationally and in several weeks' time lost essentially all of my net worth through reckless trading in the stock market. At the time I had been investing money for my children, my parents, and my in-laws. It was after this that I started lying to people. I began to falsify documents and I pretended to be someone that I was not. It began with small loans and over time they grew in size as I continued to lose money. As the effective interest rates that people charged me increased, I agreed to pay rates greater than 30%, 40% and in one instance 227% per year.  I borrowed more and more money to repay other people I owed money to. I had started an unplanned Ponzi scheme and I could not figure out how to stop. I lied to my victims and gave falsified documents to many of the people that I owe money to.   What I did is unforgiveable.

███████████████████████████████████████████████████ I could not continue to live my life of lies. ██████████████████████████████████████ ███████████████████████████████████████ At this incredibly scary place I found my third life. I came to my senses and could not live with myself for what I did and the pain I inflicted upon so many people. I reached out to the U.S. Attorney's Office in the EDNY and then the SDNY and confessed my crimes. I wanted to move forward and attempt to repay the money and repair the lives of those that I had hurt. I spent many hours with AUSA Chong and Postal Inspector Rizzo telling them everything that I had done wrong. I confessed with my statements and turned over documents to confirm my guilt, including a document explaining everything that I prepared to help the government understand my crimes. I do not ask for or expect sympathy or understanding for my behavior. I lost everything that was important to me. My wife of 33 years, perhaps the biggest victim of all has divorced me. Two of my sons have not spoken to me in more than a year and a half. My middle son, Brett, who speaks with me almost every day, did not invite me to his wedding. I am not invited to my oldest son Ross' wedding in June.

In this third phase of my life, I am passionately working to repay all of my victims. I was fortunate to discover the SEC Whistleblower program. This governmental program pays the whistleblower between 10% and 30% of whatever the government collects, and in 2021, 85% of the awards were the maximum of 30% .  Approximately 100 cases each year result in payments to the whistleblower with the

largest award ever being $279 million. ████████████████████████████████
████████████████████████ I scoured SEC filings on its EDGAR website and
documented that they had violated many securities laws.

I am providing you with some details of my work, so that you can understand that there is a
legitimate probability that I will earn enough to repay everything that I owe. This work turned into five
different whistleblower cases that I have filed since February 2022. ████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████ I have
not used counsel for all of the cases as I do not want to pay legal fees that could go to the people I have
hurt. ███████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████

I have devoted virtually every day, approximately 16 hours per day, 7 days a week to my goal of
making restitution to the people I have hurt. I have examined thousands of SEC filings made by people
and companies that I am not affiliated with. I have probably read more than 200,000 pages to identify
criminal and civil acts that has resulted in my filing the 5 SEC Whistleblower claims and a 6th private civil
case. In addition, on June 1, I filed my 16th supplemental submission to the 5 whistleblower cases
detailing additional infractions by these parties.   These frequent supplemental submissions are critical
to getting the government to investigate these cases before the other thousands of submissions that are
made each year and increase the likelihood that I am paid the full 30% reward. ████████████████
████████████████████████████████████████████████ In these cases, I was able to uncover
systemic and deliberate violations of securities laws using only access to EDGAR and persevering for
many hours poring over filings. ████████████████████████████████████████████████
████████████ I am currently working on three new whistleblower cases.  There is no way for me to know
which cases the SEC ████████ will pursue most aggressively, and I will keep filing new whistleblower
cases, supplemental submissions on existing cases █████████████████████████████████████
████████████████ until I have repaid all of my obligations.

 If Your Honor is amenable and would benefit from more information, I would be happy to
present to you the voluminous submissions and backup documentation of these criminal and civil
violations and demonstrate to you in detail the magnitude and severity of these crimes.

 Given that I am only represented by counsel on only some of these matters I will have no way of learning about a government collection or even applying for the whistleblower reward when I lose internet access if I am incarcerated.

All of this work has served two purposes. It provides me with a path to repay my victims and the positive feeling that I am uncovering and helping the government prosecute corporations and individuals who have committed fraud on our financial markets.

Instead of going to the government to try to trade my first whistleblower case for my freedom, I filed it under the whistleblower program as the first step to repaying the people I have hurt. I want my victims who are largely unaware of what I am doing to know that there is a path and a plan to repay them. I understand that even the victims who are aware of but have not seen these filings have no reason to believe in their substance and the merits of my work.

One of my many concerns is that given the sheer number of corporations and people I have accused of wrongdoing, if I am incarcerated, without internet access, I will not be able to see the SEC Covered Action postings to make sure that the appropriate filings are made within the applicable 90 day window. The government does not notify the whistleblower of a successful enforcement. The whistleblower needs to review the SEC postings each day. The whistleblower has to be aware when the SEC has made a collection and make a proper application to receive the compensation that they have earned. Given the complexity of the cases and the number of potential wrongdoers, it is effectively my responsibility to pay attention to what is going on in the more than 350 allegations, especially in the matters that I filed without counsel. I am also concerned that if I am not able to make subsequent supplemental submissions and file new whistleblower cases, which serve to reinforce the claims I have already made, then the process will drag on for years longer than necessary. I hope that I have enough time to see that these whistleblower cases repay everybody in full. I will not rest until that happens.

My third life is different from my first two lives. In my first life, everything revolved around my family. Robyn and I were inseparable. Everything was about our children, family dinners, academic pursuits, travel sports, games of chess, trivia questions of the day, and inspired discussions. In my second life, when I was committing these horrible crimes, my family, and friends, those closest to me did not realize that I was a different person. Now in my third life I spend almost all of my time working to earn the money necessary to repay my victims.  I have also found meaning in community service.  The Bowery Mission was just a few blocks from where I was living in February. I read about how they helped and supported people for approximately 150 years. I volunteered at The Bowery Mission more than 35 times and I have more recently volunteered at the Legacy Center in Queens. I served and prepared meals, mopped floors, wiped tables and chairs, and distributed food to people that are most appreciative for the help that they receive. Once my victims are paid back and I have satisfied all of my financial

obligations, I hope to be in a position to contribute financially to their mission.  I read about the acute need for platelets for these patients, which made me want to donate blood to help ███ cancer patients. I have donated platelets at the NY Blood Center 28 times since January 2022. The Blood Center estimates that my contribution over the past 16 months have saved approximately 84 lives. I overcame my fears and became an organ donor. My unlawful actions have cost me my family. I hope that ███████ health is well but I am not there to know. ███████████████████████████████████ I am not the same person that I was for the first 55 years of my life, and I am certainly not the same person I was for the next few years.

Judge Vyskocil, I appreciate the concern that you, Evelyn Alvayero, Peter Turco, Dr. Witek, Evan Stern, AUSA Chong, Inspector Rizzo, and everyone have shown me. I would also like to apologize for your frustrations with me. Prior to February 2023, I did not agree to a plea agreement and then subsequently change my mind. I have respect for you and for the process and never misled you or wasted your time. The plea agreement took so long to resolve because the SDNY would not agree that the first money I repay goes to my victims instead of to the government for forfeiture. After the SDNY said that it is the SDNY's practice to apply payments first to repay victims, I pled guilty. It is my hope that is what will in fact happen. It is my confidence in these whistleblower cases, researched and filed to repay my victims, that made this issue so important to me.

With each supplemental submission, and each filing of a new whistleblower case, the probability of repaying my debt to the people I have hurt, and to all of society increases. I ask for no sympathy or understanding about what I did wrong. I deserve to be punished, but I respectfully request that you not punish the people I have already hurt. Sending me to prison will only inflict more punishment on them. Please let me continue to work on these cases and earn back the money I owe these people. I read several victim impact statements and I cried as I thought about the pain I have caused people. I understand why these people believe the worst about me, even if some of it is not true, and want to say it to Your Honor to make sure that I am punished. It will not, and it should not change my victims' opinions, but they should be aware that there is a realistic path for them to recover everything they lost and more. I hope that someone will share this information with them, not to influence their feelings towards me, but to let them know that they have not been forgotten and there is a path to repaying them. I am asking Your Honor for leniency so that I can continue to ███████████████, investigating continual wrong doings by these actors, and make frequent submissions of these ongoing crimes. There will be nobody following each detail to make sure that when the SEC posts notices of awards my victims are entitled to, that they are claimed within the allotted 90 days. I do not know what is most important to the people I have hurt, but I am sure that while they believe I should be punished, that repayment is their greatest desire.

These past 18 months I have focused on helping the people that I have hurt. I beg that you give me the opportunity to at least make their financial lives better, as best I can. Because of my actions I no longer have contact with most of my family or friends. My lies have hurt many people. The only thing I have left is to succeed in repaying my victims. I will never again have the life I loved so much. I am virtually all alone in the world because of my actions. Repaying people will not restore the relationships that are permanently gone, but it will help the people I have hurt and even help society after the investigations are complete.

I know that I need to be punished but I ask for mercy. Please allow me to continue my path to repay each person.

Respectfully,

Jeffrey Soberman Parket

# Exhibit 2

Dear Judge Vyskocil,

Thank you for taking the time to read my letter. The defendant before you now is my father, and today I still call him my dad. I write this letter to you with great sadness and confusion, but I believe that it is important that the totality of his life, both who he was and who I believe him to be today, is expressed to you.

I want to share with you a question that I believe is the most important question to me today. Growing up, I used to cover my bedroom walls in pictures of professional athletes. I used to look up to them for their hard work and dedication. However, my father had only one rule – if one of these athletes did something bad then their photo would be taken down off my wall. Today I look back and realize that we never discussed if I should hang the photo back onto the wall if the person had subsequently tried to be a better person. My question now is, when their photo is removed from the wall, should it be thrown away forever, put in the back of the closet and never looked at again, or can the person's photo go back up if they've demonstrated an effort to be a better person? I understand that the totality of my dad's life isn't on display in the court room or in the filings, but I hope that it is considered in your decision today.

My dad was my north star in life, and he made his life all about family. Every night of the week growing up we had family dinner. He was home every night for dinner, and not once did he ever go out with a friend or colleague instead of coming home to be at the family table. Family was the center of his world. At and after dinner he would spend time asking about what I was studying in school and he would always try to help in any way he could. He attended every parent-teacher conference and paid close attention if I was struggling. Looking back, he never once told me I needed to obtain a certain grade but rather only advised me that, if I thought I worked as hard as a I could, then I should be proud of whatever grade I received. He was my rock and support system as I pushed myself in my education, which was always the most important thing to me.

We shared a lot of common interests that made the bond between us stronger. In around 2016, we had developed a system to make airplanes safer. We lived a short distance outside of NYC and given the lifetime impact of 9/11 and a recent airline hijacking overseas, we desperately wanted to help society in this endeavor. We spent countless hours each week studying FAA guidelines and processes and ultimately filed for a patent on the solution. My dad's passion for contributing to society here was on display when he wanted to give the solution away to the airlines for free. He felt strongly that it was more important to successfully help the community than it was to make a profit even if it could have been warranted. There was no greed with my dad. He did not try to raise money from anyone to support this project and he also didn't even try to profit from it.

In April 2018, it is clear that his life took for a horrible turn. ██████████████████ ██████ and my dad broke down hysterically at the table when telling me about it. It was clear that on his mind he was thinking about how he lost his mom when he was only a

young teenager and he was terrified of what was going to happen. ███████████

Unfortunately, my dad's nightmare wasn't over. ████████████████████ that his father unexpectedly died. I will never forget that evening we went to the hospital while my grandfather's heart was failing and we were told that he wasn't going to make it. My dad was on the floor next to his dad's hospital bed, begging for a different outcome. I wondered that night if my dad was even going to survive until the next day, given how exhausted and lifeless he looked. Yet despite the pain, the very next day he was back to being a rock for everyone else, compartmentalizing and hiding the grief to look strong for his immediate and extended family. Everyone had always looked to him for the reassurance in the room, and the reliance on him did not pause for a moment. Immediately he became my grandmother's, his stepmother, go-to call person for absolutely everything imaginable. It didn't matter the time of day; he spoke to her probably every day to help her get on her feet in every aspect of life.

I have confidence that my dad was always the person that I thought he was. When the truth of the last few years started to unravel, I spoke with several his friends to see if there was anything that my family had missed during our lives. They all completely dismissed the notion that he ever harmed or lied to someone in his past. He was constantly described and teased over the years as being the most pathetically honest person that anyone could ever meet. He would fight to protect his family, friends, and business associates. If something went wrong, he was the most tenacious person in advocating for a solution. He was always very wound up about doing the right thing, legally and ethically. I can't understand how this all happened, but something so terrible must have occurred for him to go against a life of integrity.

Since a young age my father let people put the weight of the world on his shoulders. Unfortunately, he was not strong enough to ask for help when he needed it. When I compare his transgressions to his life, they clearly appear to be based out of desperation and a complete aberration from who he really is. When he came forward and admitted what he had done, I asked him what kind of person he wanted to be now. He told me that the only thing he cared about was repaying people. For the last year and a half he has solely focused on doing just that. He discovered the SEC whistleblower program that would enable him to investigate and report wrongdoing at companies and earn money to repay people. To be clear, he was not 'turning in' people he knew. Instead, he has spent likely more than 110+ hours per week for 1.5 years reading public documents and building cases to earn the income he may receive. This has been a very unique form of community service, as it will ultimately repay his victims *and* society. I knew he was starting a new chapter of life when instead of trying to use his first case to try and negotiate a better plea deal for himself he decided to submit the

case under the government program so he could earn money instead to repay everyone. By virtue of the program, ███████████████████████████ ████████ but he explicitly put repaying his victims ahead of any potential benefit for himself. I think that this characteristic demonstrates the peculiar nature of my father vs. what I believe someone else would've done if they were inherently selfish and only thinking about themselves.

I'm not sure that many people in his position right now would've taken this path. I believe that the work he is doing on these cases is tremendous and gives a high probability that he will be able to make complete restitution one day. Whatever his punishment, I hope that he has access to a computer to continue this work all day until everyone is paid back in full plus the interest that he agreed to pay no matter what the rates were. The crimes he is uncovering have been occurring in broad daylight for more than a decade, and thus when he is incarcerated these investigations will have a hard time moving forward. Additionally, he will need to monitor the government websites daily for when a successful action is completed, otherwise he will miss the opportunity to even apply for the reward. This effort requires constant access to a computer, otherwise no money will be collected. ████████████████████████████████████ ██████████████████████████████████████ I believe that this is a path to be able to repay everyone and simultaneously provide incredible value to society. As a victim I want to be paid back, and I believe that incarceration will hurt the chance that I and others will be repaid in full.

His complete dedication to the mission of repaying people and helping society right now represents a different person than what can be gleaned from the information in the docket. He has even neglected his health. ███████████████████████████ ████████████████████ Despite living alone in unideal conditions and with minimal contact with other people, he has not wavered from his goal of helping others today. Repaying people in full is his number one priority.

I do not know what a fair punishment looks like. I would ask that before delivering a punishment that you read one of his case submissions and determine if you think it has merits. Every few weeks he uncovers additional facts and submits additional analysis to help the government in its investigation. It would be a shame if he stopped working on these investigations today and his income from them wasn't high enough to make a complete repayment. I believe that he will not stop working until he has succeeded in the goal. I fully believe in my heart that he would never reoffend again, and I hope that after learning about what he has been spending his time on over the last year and a half that you can share that faith with me. I know that he has already started and will continue to be a model citizen again going forward.

I ask the original question again, can we put someone's photo back on the wall after it has been taken down? Can an idol ever be given another chance? Before you today is

someone who never asked anyone for help, and today is working to do the right thing for his victims and society. He has taken responsibility for his actions and has been taking steps to make restitution. I believe that the last year and a half has demonstrated to me that my father is committed to being even better than the original person he was before he committed this crime. While many people today may hate him so much that they prefer his incarceration, I truly believe that would re-victimize all of us right now. I hope you see the unique nature of my father and consider all the good that he has and will do for society if given the chance to continue his work.

Thank you,

Brett

# Exhibit 3

May 11, 2023

United States District Court Judge
Mary Kay Vyskocil
Daniel Patrick Moynihan
United States Courthouse
Courtroom 18C
500 Pearl St.
New York, NY 10007-1312

**Re:   United States of America ("USA") v. Jeffrey Soberman Parket
("Jeffrey")  Case No. 1:22-cr-00311-MKV**

**(Sentencing of Jeffrey Parket )**

Dear Judge Vyskocil:

My name is Robyn Kauffman Parket and I write this letter for Jeffrey Parket for you to consider in the upcoming sentencing hearing.

I was married on September 2nd, 1989. I have 3 wonderful boys with Jeffrey: Ross(31), Brett(28), and Adam (25). Jeffrey was a wonderful father. He was always there for them, whether on the sports field or during their school years. As the boys got older, he became more of a friend to them. He was always there for advice and guidance.  He spoke to them almost daily, and Sunday night dinners were always looked forward to eagerly.

 I too was happily married. I trusted my husband implicitly. I relied upon him for almost everything.  Our friends and his contemporaries sought him out for his creative insightful way of thinking.  He was a very trusted and well respected

man.  I don't know when we lost him,  but on November 30th, 2021 our world was shattered. The boys and I were left devastated. I moved in with  with my parents in Florida and  I have since filed for divorce. My relationship with my son Ross stopped, but we are now in the process of restoring it. His wedding was postponed.

I lost the most treasured thing I had and that was my family. I am grieving with my kids, but I can't imagine bringing more pain and suffering to my family.

 I ask the court to please be kind in sentencing Jeffrey. He is working very hard to make restitution to his victims

Thank you.

S/ Robyn Parket

# Exhibit 4

Dear Judge Vyskocil,

I keep staring at a blank computer screen, trying to find words for a letter a sister shouldn't be in a position to write, for my older brother, the last person I imagined would need it. The word I would have most likely used to describe him, before I answered his call, December 2021, moral.

He did what he thought was right.  He didn't always get it right and didn't always understand when he got it wrong, but he tried.  He and I had very different childhoods.  Most of his formative years were spent traveling among our parents' apartment in Flushing, his school, our Uncle's apartment down the street, and trips to the corner store to get milk or eggs.  He did this at an age when my dad still pinned my house keys into my pocket when my daughters' school would not allow them to walk up our private road alone.

Our father was a child of the Great Depression. Our grandfather lost his job. Our father lost his mom to breast cancer when he was three. Raised in foster care and orphanages; he lost everything. Accepted to attend the Bronx High School of Science, our father was for the first time, surrounded by possibilities. He sliced cheese at a dairy counter by day, attended City College at night. He was the first person in his family to go to college. Our mother's path beyond her own impoverished childhood was also education. A kindergarten teacher, she held graduations for her students; it could be their only ones.

She later stayed home to care for Jeffrey and our father. My brother watched our father study for his Ph.D. at Columbia and struggle to write his dissertation. His childhood home was warm, loving, and supportive. Like our parents, Jeffrey was expected to, and raised to shine. Our mother's mother told stories about how my brother read the four questions in Hebrew, from the Passover Haggadah prayer book somewhere around three, his prayer book upside down. I found the story no less impressive.

I was not easily conceived; Jeffrey was their only child for 11 years. Two years after I was born, our mother was diagnosed with breast cancer. She was 38. It spread to her bones. First she needed a cane, then a walker. When she couldn't get out of her bed, our father, in denial still said she would be fine. She died at 40 years old. Our father would shut the laundry room door, turn on the dryer, and howl his sorrow into the pillow he left there. He hoped either would muffle his pain.

Responsible. Moral. A rule follower. Our mother died as a new school year started. A woman cooked, cleaned, and helped care for Jeffrey and me. When our father returned home from a work trip, the woman wasn't there. Jeffrey had seen her stealing our cans of tuna, and Jeffrey explained to our father, that at 15-years-old he fired her, and he took care of me. He didn't trust her to care for either one of us. Jeffrey bypassed his trauma and premature adult responsibilities, somehow never missing a beat in school. Our father remarried a woman with two sons of her own, just before Jeffrey went to college, He graduated from the University of Chicago in three years and received his MBA from the University of Michigan one month shy of his 23rd birthday. Michigan waived their work experience requirement when Jeffrey explained,

with work experience, he would be accepted by, and attend, Wharton. He went from working in a mailroom to a trading floor at Drexel. For my bat mitzvah, Jeffrey, at 24, bought me a color TV with a remote control.

Protective. Our blended family home was a hard place to live. Returning to that home was perhaps harder for Jeffrey than his commute. Jeffrey and our father got lost in conversations, time that was already at a premium prior to Jeffrey coming home, time the rest of us didn't relinquish well. Thinking it best for Jeffrey and the family, the woman our father married encouraged our father to lend Jeffrey money to buy an apartment. I stayed with him in that apartment. Our father was so proud of Jeffrey. He bragged when Jeffrey re-paid our father quickly, with interest.

While he always strived to succeed, I don't think he believed he truly could until he met Robyn. They married just as he started to achieve amazing success. Jeffrey's eyes opened, like my father's did, when my father went to the Bronx High School of Science. My brother who had grown up in Flushing, raised to surpass my father's ambitions, was realizing a life I don't think my father imagined. Robyn was the light to my brother's heavy. Jeffrey was her gravity, grounding her. They were great for each other, to each other, and role models for the marriage I wanted.

Respectful. Responsible. Robyn and Jeffrey raised three amazing men. Robyn drove them to school. Jeffrey drove them to practices and games, home and away. He sat on the sidelines. She was on the PTA and forever baking. Their boys were surrounded by wealth, with love, taught to be generous and to work hard, by engaged parents, like those who raised my brother.

Their sons are good men. They watched my girls, so I could tell their father, and then tell Jeffrey's and my father, on Father's Day, ███████████████████████████████████ ████████████████████████████████████ Our father died right after ████████████████████████████. Their boys were present, supportive, the product of being raised by good parents. Jeffrey went to services daily, for a year, to say the traditional jewish prayer when you lose a parent. Unable to do the same where I lived, Jeffrey called me every day, when the market closed and we said the prayer together for our father. It re-connected me to Jeffrey in a way I hadn't felt since I memorized the prayer, sitting beside him as he said it for our mother 40 years earlier.

His call to me in December 2021 conflicted so completely with the man I knew. I didn't even recognize the voice on the phone. I called my sister-in-law of 30+ years to help me understand how my brother who nursed a drink, who didn't smoke, and who wanted his second professional act to be as a DA was telling me any story with him on the wrong side of the aisle. He knows what he did was wrong but he can't articulate the "why."

I made financial decisions, expecting my brother would be my safety net, in an ugly divorce, but my great loss is personal.  Navigating my newly fractured family, I expected my family of origin, his family, to be mine. His choices, and mine to speak to him, shattered what family I still had.

People moved. Relationships severed. Jeffrey has no home, transportation, or money. One son pays for him to have a place to sleep. He and I, two of the only people who still speak to Jeffrey.

I don't speak much about what my brother has done. When asked if he and I speak, I say, "I do. He is my brother.  It is the court's responsibility to decide how to address what he has done. It is my responsibility to be his sister." Today, being his sister means telling you how he became the man I once knew, and who that was, before he became the man I know now.

Trying to make sense of what my brother has done, while simultaneously getting divorced, I waste my time pondering eerie similarities in the men in my life.  Jeffrey on the other hand donates his time, serving food at the Bowery Mission, donating four gallons of his blood and his platelets. He relishes the juice and snacks that don't fit into his daily $8 allotment for his three meals, but I believe he is feeding his soul. He commits the rest of his time to making restitution, his life's work. Hearing Jeffrey speak about his effort to generate this massive sum of money, I relate to his resourcefulness, am humbled by, and envious of, his brilliance, saddened he is in this position. I hear his shame, remorse. I believe he is coming from a good place in his adamance that victims be re-paid prior to the government collecting money, and that victims' losses be accurately attributed so one victim isn't over-compensated at the expense of another.

I think he is right. And I think he forfeited many of his rights with his wrongs. Still, repaying his victims is my brother's reason for living. I ask that you allow him to have that chance. Even if the court doesn't believe my brother having a reason to live should be a sentencing consideration, I implore you to allow Jeffrey to maintain access to necessary human and computer resources to finish what he has started. Allow the victims the chance for Jeffrey to help those he has hurt financially, the only thing he can do.

Jeffrey's present-day decisions are indicative of a man whose moral compass once again is straight.  He tries every day to be like the good men he raised, like the good man he was. It is the man he wants to be.

Thank you for your consideration,

Allison Berman

# Exhibit 5

Dear Judge Mary Kay Vyskocil,

5/12/2023

My name is Victor Rousso.  I write this letter as a friend and victim of Jeffrey's actions.

I have owned and operated my own business for the past 35 years.  I met Jeffrey Parket 15 years ago through my wife whose husband passed away at the age of 40, after a long battle with cancer, leaving her widowed with 4 children under the age of 13.    My wife had been friends with Jeffrey for about 20 years.

Jeffrey had a very difficult childhood.  His mother died when he was very young from cancer.   A trauma I don't think he ever fully recovered from.  I can remember him crying at times during normal discussions of his mother.   As a result of the loss of his mother, Jeffrey and his father were extremely close.  Late in 2017, ███████████████████████████████████        Then in 2018, ████████████████████████  Jeffreys father passed away.  Shortly after his father's passing, Jeffrey's life was really turned him upside down emotionally.

During the time when my wife was dealing with her husband's illness and many years after his death, Jeffrey went way above and beyond with compassion and kindness to her and the family.   He would bring the children gifts, take them to ballgames, join the families on vacation taking care of his own wife and children as well as my wife and her children.

Even after I met my wife, he continued to help any way he could.   Proofreading the children's papers, helping them with schoolwork, helping with college applications, interviews, college essays, and coaching them through life.  Jeffrey wouldn't stop; continually following up on them to make sure they were doing what they were supposed to do to get ahead in life.

For me personally, Jeffrey helped me in so many ways.  He was there for me when my business began to struggle, providing me with advice and coaching I desperately needed.  He gave up time from his workday to meet with lawyers and business professionals and guided me through the difficult times.

Jeffrey was the go-to person for many friends and especially his family.   He was the rock and person everyone went to for advice, financial and just "take care of me".  Never any questions asked, he always took on whatever anyone needed.

I have continued to stay in touch with Jeffrey to this day.   People make mistakes in life, and I feel he lost his way during the time of his father's death and ███████████████        Since Jeffrey's arrest, He has been donating much of his time to charity.   Volunteering in a soup kitchen 2-3 days per week, donating blood and platelets.

Jeffrey has expressed to me, over and over, his extreme remorse and guilt for his actions.  He has been living in solitude, with little or no money, working day and night to earn money to pay back his victims.   I truly believe his priority in life is restitution and forgiving of his friends, family, and business associates.

Jeffrey was and is a loving husband and father.  The world revolved around his family and his dedication to them was unmatched in society today.  His primary focus in life was to give his family everything he

never had growing up.   As a result of his actions, he has paid the ultimate price; the pending divorce with his wife and 2 of his 3 children are no longer speaking to him.

Jeffrey and I grew extremely close, and I still consider him one of my closest friends.    I hope he has the opportunity to, and can fulfill his promise to make restitution to his victims, reconnect with his family and rebuild his life.  I believe he will be a law abiding, productive member of society and so I ask that Your Honor is kind with his sentence.

Sincerely

Victor Rousso

# Exhibit 6

June 8, 2023

Dear Judge Vyskocil,

I am writing today on behalf of Jeffrey Parket whose sentencing is scheduled for June 28th. I have known Jeffrey for about 25 years and consider him one of my best friends. We first met professionally in the 1990's as we were both active in a small somewhat obscure market of Wall Street called the convertibles market. I was a Managing Director at Morgan Stanley and Jeff managed a hedge fund. In short, Jeff was by far the smartest person I ever met, and that is saying a lot as there are some very smart people in the financial markets.

When Morgan Stanley decided in the 1990's that they wanted to begin an effort in the proprietary trading of convertibles for its own account I knew right away that Jeff would be an incredible hire for that position, and he ultimately was hired after a series of very high-level interviews, beating out some other highly qualified applicants.

It was after his hiring at Morgan Stanley that our friendship really took off as I had much more opportunity to get to know him better. Jeffrey was an unapologetic workaholic with a love for the business and an incredible work ethic. The only thing that Jeff loved more than his job was his wife and children. A typical Monday conversation with Jeff about his weekend revealed that he spent it reading prospectuses and having quality time with his family. I don't know that he had any other hobbies and interests like golf, fishing, or watching sports, etc. While I was amazed at Jeffrey's intellect, and also his excitement and energy for his job, what I think really made me want to know Jeff better was that he was a good and moral person.

Jeff always tried to do the right thing and did things "by the book." One time, Jeff paid legal fees and found immigration help for one of his household employees. While at work, he also always treated everyone with courtesy and respect, including and especially the support people who often find themselves treated poorly by the higher ups on the trading desks. I never once heard Jeff raise his voice or use foul language on the trading desk.

I still struggle to understand how this man that I have known and felt quite close to could have done the things that he was charged with. In fact, I experienced some extreme cognitive dissonance when I first heard about it. Those acts just didn't fit the understanding of the man I knew. After a long time of thinking about this I have come to believe that it traces back to a couple of life-shaking events that occurred in close proximity to each other time-wise. Within weeks of each other, Jeffrey's Dad, who he was very close to, passed away, and J█████████████████████████ █████████████████████████. While I can't speak to the details of how this might have affected Jeffrey, I do know that the timing fits well. And I do know that besides his children there was nobody more important to Jeff than ████████████ and his father.

That is not to suggest that Jeff not be punished for what he did. It is only my working theory in how such a high integrity guy that I knew pretty well could fall so far as to do the things has admitted to doing. In recent conversations Jeff has sometimes referred to himself as a "bad person." I don't believe that to be the case. I know Jeffrey as a good person who made mistakes during a time of emotional crisis. Proof of Jeffrey's foundational integrity lies in how he has conducted himself over

this past year and change, beginning with the fact he turned himself in. Nobody caught Jeff in the act. He simply hit bottom one day, came to his senses, and went to the authorities and laid it all out on the table. When he came to his senses and realized what he had done I believe his moral compass reset itself and he embarked on a path to make things right, beginning with his confession.

From that moment on, the number one priority for Jeff was to find a way to repay his victims. For most people the idea of making restitution on a multiple 8-figure debt would seem impossible, but not for Jeff. He has concrete plans to ensure he pays back his victims, and he's been working tirelessly, employing his vast knowledge of the financial markets by pursuing SEC Whistleblower Awards through a series of lawsuits against bad actors on Wall Street. As a former Managing Director at Morgan Stanley and an expert on the financial markets, and also being familiar with the substance of these Whistleblower lawsuits, I believe that they will be successful and full restitution will be made to his victims. Having lost everything, including his marriage, his relationship with 2 out of his 3 sons, as well as virtually all of his friends and family, Jeff poured himself into this goal. However, Jeff has told me repeatedly that his goal was not only to make restitution but to go above and beyond that, providing a meaningful return to his victims. I have supported Jeff throughout this case. I know the plea process was lengthy, but I want to assure Your Honor that he's not the kind of person who would play games with the court. He wanted to make sure that his victims were paid properly and that the plea was fair. He wants to do right by the people who he has hurt. In addition to working hard to make financial amends to his victims, Jeff has been volunteering extensively at homeless missions as well as donating blood and platelets on a regular basis.

I appreciate the opportunity to help Your Honor better understand the man whose case is before her. Jeff is not a violent person who needs to be put away for society to be safe. He is physically weak and in poor health, and as such he poses zero risk to others. He has demonstrated deep remorse and a determination to make amends to his victims. Perhaps most importantly, Jeff has lost absolutely everything that matters to him - his wife, family, friends, all material possessions, and any realistic hope of a satisfying and rewarding life going forward. I submit that he is reaping his punishment every day. I ask that Your Honor not send Jeff to prison. A much better outcome for this case and for society would be to find a way to continue to use Jeff's special knowledge of the financial markets to identify more bad actors and pursue them on behalf of the regulatory agencies. I realize that my suggestion is "unique," but with you being the person who ultimately decides Jeff's fate, I truly hope that you consider this as a real possibility that serves the greater good much better than incarceration.

I appreciate the opportunity to offer my perspective on Jeff's life and his character. It is my fervent prayer that the best possible outcome is reached. Should you have any questions please don't hesitate to call me at ██████████ .

Respectfully,

Anthony Bosco

# Exhibit 7

Dear Honorable Judge Mary Kay Vyskocil,

I hope this letter finds you well and thank you for this opportunity to introduce Jeffrey Parket from me and my family's point of view.

I am a plastic and reconstructive surgeon at Northwell Heath as well as NYU, and several Catholic Health Hospitals here in New York for the past 27 years. I've become close friends of Jeffrey, his wife, and his three boys for almost that long. He and his family lived in our neighborhood and his sons went to the same grade, middle, and high schools as my own three kids; his eldest son took my daughter to her prom.

Over the course of the past years, his family as almost always the one inviting the whole neighborhood and friends and generously celebrating the 4th of July and Memorial and Labor Day weekend holidays at their home. A real patriot and in love with his wife and sons, he never lost sight of staying close to his God and Synagogue services, and doing his charitable deeds, whether in action or by financial contributions to the needy. He lovingly and proudly put his three sons through excellent and successful education at the University of Chicago, where he himself received his education. All three of his sons went onto further higher education and/or work at great companies around the country. His was a true American success and dream family to model after.



In 2018, Jeffrey dealt with a terrible blow of ███████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ Jeffrey also experienced sudden passing of his beloved father to whom he was extremely close. This was devastating for him. The entire community and his family helped get him through the difficult mourning process, but I fear that the event, coupled with ████████████, was the origin of serious psychological insult to his wellbeing.

████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ Two years ago, the same son, brought to them the wonderful news of his engagement to a resident doctor from Mount Sinai, set to be married this June.  However, because of his conduct in the case before the Court, Jeffrey is not invited to Ross's wedding. Ross and his other son Adam do not speak to him. His middle son, Brett, too announced his engagement a few months ago and his getting married soon to which Jeffrey is not invited. Brett, however, pays his rent. However, and unfortunately, his estranged wife Robin, left the state and filed for a divorce about a year ago. Neither Ross nor Adam have spoken to Jeffrey since about 17 months ago when this current

case arose, and as I understand, Ross's fiancé's family and friends have forbidden any communication or further interaction with Jeffrey. He may never get to meet or enjoy watching his grandchildren grow up. He has lost everything that he holds dear. I personally know that on at least three or four occasions, ██████████████████████████████████████ ████████████████████████████████████████████████████████, despite my and his other few remaining close friends' assurances and support.

Though not from lack of trying, and I think because Jeffrey is extremely self-conscious and, understandably, embarrassed, most of his friends and even other close family members have lost touch with him. I know firsthand that he has tried to continue and do good with his time and while under such tremendous stress and pressure, has helped teach and take care of the underserved, donate blood, and get closer to his faith and trust in God.

Jeffrey has told me, in no uncertain terms, how remorseful and regretful he is about hurting others, including his own estranged immediate family. He has told me many times that his main goal in life is to be able to hug and kiss his kids (and hopefully grandkids), none of which may ever materialize, as well as make whole those who trusted him with their friendship and money and whom he hurt so badly. He is one of the most intelligent and knowledgeable people I've ever known and, given the opportunity and in a controlled and supervised environment, he can be a true and educational asset in the field of finance and business and mathematics. He will undoubtedly perish in a prison setting, and I implore you to have mercy on him and forgive him as I know he is extremely remorseful and wants to atone and give back to our society in any way and shape possible.

I would be delighted to talk to you or other members of the court system should you need further comments or clarification about my letter.

Thank you,

Homayoun Sasson, MD, FACS

Director of Hand and Plastic Surgery at Plainview and Lij Valley Stream Hospitals at Northwell

# Exhibit 8

B"H



THE ALEPH INSTITUTE

NATIONAL HEADQUARTERS
9540 Collins Avenue, Surfside, FL 33154
Phone: (305) 864-5553

WEST COAST BRANCH
4221 Wilshire Blvd, #170-6
Los Angeles, CA 90010
Phone: (424) 210-3685
www.aleph-institute.org

**Rabbi Yossi Bryski**
ybryski@aleph-institute.org

**Chairperson / Founder**

Rabbi Sholom D. Lipskar

**President**

Lloyd S. Rubin

**Board of Directors**

Robert Danial

Boruch Duchman

Joy Fishman

Stephen Fiske

Russel Galbut

Reuven Herssein

Daniel M. Holtz

Alberto Kamhazi

Sonny Kahn

Rabbi Aaron Lipskar

Rabbi Sholom D. Lipskar

Morris Mendal

Lloyd S. Rubin

Eric Stein

Sylvia Urlich

**Executive Director**

Rabbi Aaron Lipskar

**Director of Operations**

Moshe N. Barouk

**Director of Outreach Programs**

Rabbi Menachem M. Katz

**Director of Military Programs**

Rabbi Sanford L. Dresin

**Director of Advocacy**

Rabbi Zvi Boyarsky

**Director of Outreach Programs**

Rabbi Shua Brook

**Chief Financial Officer**

Yosie Lipskar

June 14, 2023

The Honorable Mary Kay Vyskocil
United States District Judge
Southern District of New York
United State Courthouse
500 Pearl Street
New York, New York 10007-1312

Re:        ***United States v. Jeffrey Soberman Parket***
           Case No. 22-CR-00311-01 (MKV)

Dear Judge Vyskocil:

I write on behalf of the Aleph Institute ("Aleph"), with respect and deference to the Court, regarding the sentencing of Jeffrey Parket ("Jeffrey"). We support the sentencing recommendation made by Jeffrey's defense team and, in support thereof, share our sentencing proposal that, we humbly submit, would further the goals of sentencing in achieving optimal results for Jeffrey and for society. We are grateful for your consideration of this submission.

We genuinely hope and pray that we may be of service to the Court by providing the following meaningful alternative to incarceration for your consideration. We recommend that the Court consider a sentence for Jeffrey consisting of a period of home confinement, together with a program of community service, psychotherapy, and spiritual counseling, in lieu of incarceration. We believe that incarceration would not provide any meaningful benefit to Jeffrey or to society. In contrast, our proposed plan (together with the community support system that we have established for Jeffrey) would be rehabilitative to Jeffrey and beneficial to the community at large. We are hopeful that you will find that our presentation effectively addresses the compelling



facts and circumstances specific to this case, and we are available to provide any additional input that may assist you in your sentencing decision.

## I.  THE ALEPH INSTITUTE.

The Aleph Institute ("Aleph") was formed in 1981 at the direction of The Lubavitcher Rebbe, Rabbi Menachem M. Schneerson, *may his merit shield us,* to provide support and rehabilitation to individuals enmeshed in the criminal justice and penal systems.[1] Aleph became a reality during a meeting between Rabbi Sholom D. Lipskar and the Honorable late Jack Weinstein of the U.S. District Court for the Eastern District of New York. Judge Weinstein wrote the following about Aleph: ***"[T]he Aleph Institute, and [its] associates understand and force us to face the fact that each person deserves to be treated with respect as an individual personality and not as . . . a faceless number****."*[2] Judge Weinstein continued, "[Aleph's] assistance to defendants and their families provide standards of compassion and aid worthy of emulation . . . As a result of its good work, Aleph is widely known and respected by penal and judicial authorities."

Aleph's work in the realm of criminal sentencing has been devoted to the development of effective alternative sentencing options. Our many years of experience have taught us that, in certain cases, the goals of the criminal justice system can be accomplished by alternative means, without compromising the need to promote criminal justice goals such as rehabilitation, retribution, deterrence, and incapacitation.  We work closely with courts, federal and state lawmakers, law professors, and penal experts towards our common goal of achieving outcomes that promote justice, lessen the burden on shared penal resources, reduce recidivism, and benefit offenders, together with their families and communities. We take seriously our mission, which former FBI director and retired U.S. District Judge, the Hon. Louis Freeh, eloquently summarized as "championing and delivering justice to people who have been overlooked or forgotten by the rule of law, giving them hope, relief from suffering and the chance to improve their lives and fortunes." We are further guided by our ethical teachings which emphasize that every individual – no matter his shortcomings – naturally has a positive purpose to fulfill in the world.

---

[1] www.aleph-institute.org; *see, also*, <u>Appendix: The Aleph Institute</u>, attached hereto.
[2] Hon. Jack B. Weinstein, Prison Need Not Be Mandatory: There Are Options Under the New U.S. Sentencing Guidelines, 1 JUDGE J. 16, 28 (1989).



THE ALEPH INSTITUTE

Since its formation, Aleph has submitted alternative sentencing recommendations in hundreds of criminal cases (federal and state) throughout the United States. We advocate for alternative sentences for individuals in whom we detect a deep sincerity and a genuine willingness to make positive changes in their lives. Further, we only advocate on behalf of individuals who have passed our rigorous screening process, and we do not advocate for any individual unless we are confident that they do not pose a future threat to society. ***We provide our services on a pro bono basis, motivated only by our sincere belief in the work that we do.***

We readily acknowledge that prison terms are often necessary as appropriate punishment for serious offenses and/or to protect the public from violent, predatory, or unrepentant offenders. Still, courts have observed that ***"[i]ncapacitory sentences are usually unnecessary to increase public safety, or prevent recidivism; they place a tremendous financial burden on society through excessive incarceration."***[3]  In our experience, lengthy periods of incarceration inhibit defendants from fulfilling their potential, and devastate the family and community left behind, breeding bitterness, anger, insensitivity, and eventual recidivism. Too many defendants "lose their claim to a future" when "lengthy prison terms" are substituted for "reasonable, innovative, and promising alternatives to incarceration."[4] We find that our sentencing philosophy is given excellent expression in these words from William Fitzpatrick, the former President of the National District Attorneys Association, who suggests that ***"that we use prison for those we are afraid of, not those whom we are mad at based on their behavior."***[5]

---

[3] *United States v. Rivera*, 281 F. Supp. 3d 269, 271 (E.D.N.Y. 2017).
[4] *United States v. Dossie*, 851 F. Supp. 2d 478, 478 (E.D.N.Y. 2012) (internal quotation omitted).
[5] April 26, 2016, letter to Senators Mitch McConnell and Harry Reid.

3



THE ALEPH INSTITUTE

## II.    JEFFREY PARKET

### Jeffrey's Background

Jeffrey's childhood was characterized by enormous love and caring, but also by tremendous pain. He grew up modestly but comfortably, and had a traditional Jewish upbringing. His mother, Reba, passed away when Jeffrey was just 15 from breast cancer. For the last few years or her life, as the cancer ate away at her physical body, Jeffrey cared for her. Throughout her treatment, Jeffrey stood by his mother's side. This was certainly an enormous emotional burden for any adolescent boy to manage. To add to the trauma, Jeffrey watched as his family spent just about all of their money on his mother's care.

Following his wife's death, Jeffrey's father, Irwin, was determined to remarry as quickly as possible. He believed that the children – especially Jeffrey's younger sister Allison – needed someone to help care for them. Irwin had also lost his mother to breast cancer at a very young age. Irwin spent ten years living in an orphanage until his father remarried and he was able to move back home, and he did not want his children to suffer the same fate. Still experiencing severe depression because of the loss of his wife, Irwin went on date after date, until he met and married Noelle about a year and a half after Reba's death. Noelle had two sons – Seth and Marc – from a previous marriage.

Jeffrey was always the responsible member of his family – he served as a second father to his younger sister Allison following their mother's death and Irwin's remarriage. He did well in school, and obtained his undergraduate degree from the University of Chicago. In 1989, Jeffrey met Robyn, and they married the same year. Together, they raised three intelligent and successful sons: Ross, age 31; Brett, age 29; and Adam, age 25.

### Pain, Suffering, and Remorse

Jeffrey's actions have, perhaps understandably, devastated his family. After more than 30 years of marriage, he and Robyn are divorcing. Neither Ross nor Adam have any contact with their father. ██████████████████ Despite his continuing love for Ross and Adam, because of his behavior, he has no way of knowing how they are coping, or of showing that he

4

B"H



THE ALEPH INSTITUTE

still loves them. Jeffrey was not invited to his son Brett's wedding, and he was also not invited to Ross's wedding (in June).

Jeffrey experiences constant and profound remorse for his actions. In his letter to the Court submitted as an exhibit to his sentencing submission, he writes,

> "I know the difference between right and wrong and have no justification for my actions. I hurt the people that I care the most about in life. I make no excuses for the way I treated my family, my friends, and lenders that I came to know over the past few years. I can never make amends for the emotional pain that I have inflicted on people who trusted me. None of them deserved to be treated this way. I would give anything to have conducted myself differently."

He explains that he has lived "three very different lives." For the first 55 years of his life, Jeffrey lived as a "model citizen," never breaking any laws, and caring for and supporting his beloved family. Jeffrey's "second life" began in 2018: ██████████ ██████████████████, and his father passed away. Though he makes absolutely no excuses for his actions, Jeffrey embarked upon the period of reckless behavior that culminated in his current situation.

Jeffrey's "third life" began shortly after ██████████████████████. He explains, "I could not continue to live my life of lies." ████████████████████████  He writes,

> "At this incredibly scary place I found my third life. I came to my senses and could not live with myself for what I did and the pain I inflicted upon so many people. I . . . confessed my crimes . . . I wanted to move forward and attempt to repay the money and repair the lives of those that I had hurt."

Jeffrey now spends almost every waking hour working to repay the victims of his crimes – as his purpose in life has become "making restitution to the people I have hurt." He explains that this work serves two purposes: it provides him with a path to hopefully repay his victims, and also gives purpose to his life. Jeffrey's life has always revolved around, and been defined by, the love he shared with his family. When he lost that, he also lost his main purpose in life. He now has a purpose – to repay his victims, to regain the trust and love of his family, and to live as a productive and law-abiding member of society once again.



THE ALEPH INSTITUTE

**<u>Jeffrey is a Strong Candidate for Alternative Sentencing</u>**

Through our extensive work with Jeffrey, we have had an opportunity to understand him as a complete person, separate and apart from his criminal conduct, and we have seen all the good of which he is capable. We are aware of the nature and circumstances of his offenses, and we acknowledge that his actions were inexcusable. We have counseled him as he faced all the challenges resulting from his conduct, and we have supported him as he engaged in efforts to learn and grow from his experiences. We have consulted with Jeffrey's attorneys, and other professionals, in an effort to understand how he may best move forward and repay his debt to society.

Jeffrey has already begun to use the incredibly painful experience initiated by his criminal conduct to better himself, as well as to help others. In our interactions with Jeffrey, we see that he is learning and listening, and we believe that he, his family, and his community, would be better served by a sentence consisting of a period of home confinement, together with a program of community service, psychotherapy, and spiritual counseling, in lieu of incarceration. We have also established a network of community support for Jeffrey that will enable his rehabilitation, and will ensure that he has access to the resources he will need as he rebuilds his life. Our alternative sentencing proposal would allow Jeffrey to continue on this path of growth, while also allowing him to continue to benefit his community and society.

**<u>Alternative Sentencing Proposal</u>**

As an organization motivated by the universal truths of moral and ethical behavior laid forth in Jewish law, we respectfully suggest that the following proposal would be an appropriate sentence in lieu of incarceration.

*<u>Home Confinement</u>*

We propose that the Court sentence Jeffrey to a period of home confinement, which would allow him to continue to work to repay his victims, and (with the Court's permission) to engage in the program of community service, spiritual counseling, and psychotherapy discussed below. A sentence whereby Jeffrey would remain in the community would also allow him to begin to rebuild the relationships with his family that have been devastated by his actions.

6

B"H



THE ALEPH INSTITUTE

_Community Service_

### The Bowery Mission

The Bowery Mission[6] helps New Yorkers overcome homelessness and marginalization by providing compassionate services and a transformative community. Its programs include compassionate care (meals, shelter, clothing, showers and more), assisting adults in crisis achieve personal goals and overcome trauma, transitional housing, and children's services. The Bowery Mission also offers year-round opportunities for enrichment through Mont Lawn City Camp, culminating in summer camp for hundreds of children.

Jeffrey has spent many hours preparing and serving food, drinks, cleaning tables, and mopping floors. He writes that the people he serves "are most appreciative for the help that they receive." With the Court's permission, Jeffrey will volunteer with the Bowery Mission for five hours each week.

### The Legacy Center

The Legacy Center,[7] located in Flushing, Queens, was formed in 1996, to provide gifts for children whose parents were incarcerated, and backpacks to local students whose parents were struggling financially. It has expanded its services to support its mission of serving its neighbors and surrounding community through acts of compassion, justice, community service, and intentional leadership development.

Jeffrey goes almost every Thursday to The Legacy Center, where he spends four hours distributing food to approximately 400-600 individuals. With the Court's permission, Jeffrey will volunteer with The Legacy Center for five hours each week.

### Tomchei Shabbos of Queens

For more than 30 years, Tomchei Shabbos of Queens[8] has provided food packages on a weekly basis to needy families and individuals throughout Queens, New York. Tomchei Shabbos' services are provided wholly by volunteers. With the Court's

---

[6] www.bowery.org.
[7] www.tlcnyc.org.
[8] www.tsqinc.org.

7



permission, Jeffrey will volunteer for 10 hours each week packaging food at Tomchei Shabbos.

*Spiritual Counseling and Community Support*

### Chabad Youth Queens

Chabad Youth Queens[9] provides children's educational services, financial support, as well as food to those who need it. Rabbi Yaakov Horvitz is the Director of Chabad Youth Queens, and he has agreed to serve as a spiritual mentor to Jeffrey, by meeting once a week, in order to ensure that he remains on the straight path with unwavering integrity. Rabbi Horvitz has also agreed to assist Jeffrey in finding affordable housing.

### Chabad of Rego Park

Rabbi Eli Blokh has led Chabad of Rego Park,[10] in Queens, New York, since 1997, and remains deeply committed to ensuring his congregants are taken care of physically, spiritually, and emotionally. Rabbi Blokh has agreed to participate in a monthly counseling session with Jeffrey, where he would assess Jeffrey's needs and rehabilitation, and guide him on a virtuous path. Rabbi Blokh's synagogue also offers extracurricular Torah Classes throughout the week, which Jeffrey would attend.

### Tomchei Shabbos of Queens

Yitzchok Katz, Director of Tomchei Shabbos of Queens, has been dedicated to feeding the hungry since 1984. Yitzchok has helped tens of thousands of people in their time of need, and he has graciously offered to create a warm network of support Jeffrey. Jeffrey will always be welcome at Yitzchok's home for a warm meal and encouragement, and Yitzchok has also offered to provide Jeffrey with food until he is back on his feet. Yitzchok has also agreed to help Jeffrey with appropriate housing solutions once that becomes necessary.

### *Crime and Consequences* Class

---

[9] www.chabadyq.com.
[10] www.chabadrego.org.

8



THE ALEPH INSTITUTE

As part of his program of rehabilitation, Jeffrey has been attending my weekly class entitled Crime and Consequences, and I can report that he is a steady participant. Crime and Consequences explores 3,000 years of Jewish history and wisdom addressing criminal conduct, sentencing, deterrence, and rehabilitation. The course is designed to challenge participants by applying Talmudic principles to modern-day cases, thus getting to the heart of critical questions surrounding individual, community, and societal goals in punishment and sentencing.

Through the course, I attempt to help participants discover and recover the straight paths from which they have veered. This involves encouraging heartfelt discussion about how to avoid gray areas or practices that seem even remotely unethical. Crime and Consequences examines the extensive and systematic program of repentance laid out in the Talmud, and considers the insights this process holds for present-day criminal rehabilitation. The course and conversation is heavily focused on individual remorse, introspection, and a commitment to growth and transformation.

Jeffrey describes that these classes provide him with a fresh perspective, and his efforts are already having a strong effect. Jeffrey has explained to us, "every class forces me to ask myself . . . what could I have done better and what can I do now that that circumstance is here? . . . what is the best way make sure that I never go back down the destructive path I was on?" I have been very encouraged by Jeffrey's progress so far, and I look forward to his continued, thoughtful participation in the class.

*Psychotherapy*

**Application of Sentencing Factors**

*Retribution*

Jeffrey has already experienced tremendous pain and suffering as a result of his actions. Moreover, under our proposal, Jeffrey will continue to have requirements placed on him in the form of home confinement.

9

B"H



THE ALEPH INSTITUTE

While not a formal element of our proposal, as previously discussed, it cannot be denied that Jeffrey has already experienced tremendous shame and humiliation as a result of his arrest and conviction. Maimonides and Jewish Law both emphasize that shame can occasionally serve as a substitute for standard punitive and deterrent elements. Shame suffered by an individual should not be undervalued or underappreciated.

### Deterrence

A period of home confinement, as well his participation in community service and spiritual counseling, will serve to deter Jeffrey from engaging in any future misconduct. Further, whereas a prison sentence often fails to provide adequate deterrence, shame succeeds. Shame is a powerful reason that non-custodial sentences can be effective in deterring criminal conduct and, for the reasons discussed above, Jeffrey's shame is acute.

### Incapacitation

A period of home confinement would place significant restrictions upon Jeffrey's freedom and mobility. Further, Jeffrey has never been in trouble with the law before. He understands the damage he caused by his actions. Therefore, it is highly unlikely that he will reoffend.

### Rehabilitation

Our proposal is specifically tailored to address the rehabilitative goal of sentencing. As many scholars, the Supreme Court, and the Rabbis at Aleph have all observed, prison is often not conducive to "promoting correction and rehabilitation."[11] This is because rehabilitation is a "forward-looking" concept, promoting resocialization by emphasizing "personal reform over punishment" and "illuminat[ing] the criminal's inner struggle,"[12] and as such only works when combined with an intense personal commitment to change. Perhaps understandably, though imprisonment may satisfy a thirst for retribution, the prison environment rarely inspires this commitment in the incarcerated individual. As Judge Richard Lowell Nygard once observed, "people –

---

[11] *Tapia v. United States*, 131 S. Ct. 2382, 2387 (2011)*; see also* Benjamin L. Apt, *Do We Know How To Punish?* New Crim. L. Rev. 437, 460 (2016).

[12] Benjamin L. Apt, *Do We Know How To Punish?* New Crim. L. Rev. 437, 458-60 (2016).



offenders included – change because they see something in themselves they do not like, and they reach down inside themselves and change it. Most criminal offenders who change for the better do so in spite of prison not because of it."[13]

Whereas prison may not promote rehabilitation, community-based programs like Aleph's proposal are often effective at restoring an individual's commitment to ethical behavior. We believe that Jeffrey will be able to rehabilitate himself through these efforts, and that, in the process, he will push others to reach their full potential.

## III.   <u>CONCLUSION</u>

Jeffrey is painfully aware that his actions were terribly wrong, and he longs to make amends. He has learned a tremendous amount about himself since his conduct, and he accepts responsibility for his actions. His remorse is constant and profound.

With the utmost respect and admiration for Your Honor's wise and compassionate decisions, I hope and pray that this submission will receive the consideration that will produce satisfactory results for society and for Jeffrey.

With gratitude and prayerful wishes for all good.


Respectfully submitted,


/s/ Yossi Bryski


Rabbi Yossi Bryski
Director of Alternative Sentencing
The Aleph Institute

---

[13] Richard Lowell Nygaard, *Crime, Pain, and Punishment: A Skeptic's View*, 102 Dick. L. Rev. 355, 362-63 (1998).

**APPENDIX:**

**THE ALEPH INSTITUTE**

**INTRODUCTION AND HISTORY**

The Aleph Institute ("Aleph") is a 501(c)(3) non-profit organization committed to improving our criminal justice system so that it delivers sensible and fair justice for all stakeholders, and improves conditions of confinement and re-entry programs for those imprisoned. It assists the families of individuals facing punishment or serving sentences to deal with the many, often devastating collateral consequences of prosecution and imprisonment of a loved one, and supports members of the armed forces. Aleph's prevention program offers an array of educational opportunities designed to cultivate greater adherence to the law. By addressing the root causes of unlawful behavior, Aleph aims to inspire current and emerging generations to strive for higher standards, ethically and legally, and thus prevent collateral consequences before they even occur. Aleph also promotes the more widespread use of alternatives to incarceration in appropriate cases. Aleph supports individuals and families regardless of their religion or ethnicity, and provides all its services *pro bono*.

Aleph was created 42 years ago during a meeting between the late Honorable Jack Weinstein, U.S. District Judge for the Eastern District of New York, and Rabbi Sholom Lipskar, in Judge Weinstein's chambers. Rabbi Lipskar was inspired by The Lubavitcher Rebbe, Rabbi Menachem M. Schneerson, to create an organization that would work to change the sterile and often dehumanizing environment of prisons into environments of restoration, rehabilitation, and reformation. Similarly, Judge Weinstein understood that every person involved in the criminal justice system needs to be treated as an individual, a person, and not just a statistic.

Utilizing a spiritual focus, together with practical life skills and counseling, Aleph seeks to help individuals to recalibrate their lives, preparing them for effective reentry into society. Aleph's efforts during the past 42 years have served thousands of incarcerated individuals and their families, culminating in the reinforcement of strong family ties, and helping to facilitate a more successful transition back into the community. In Judge Weinstein's words, "[T]he Aleph Institute…understands and forces us to face the fact that each person deserves to be treated with respect as an individual personality and not as…a faceless number."[1]

Aleph has worked cooperatively and productively over the years with hundreds of current and former federal and state judges, prosecutors, probation officers, prison officials, and members of Congress from across the country – including former Attorneys General and Deputy Attorneys General, Bureau of Prisons directors, U.S. Attorneys, District Attorneys, and others. Aleph played an instrumental role in securing passage of the First Step Act of 2018, which brought about much-needed reforms to the federal criminal punishment system. Aleph has become a leading, credible voice in the ever-growing movement toward criminal justice reform

---

[1] Jack B. Weinstein, *Prison Need Not Be Mandatory: There Are Options Under the New U.S. Sentencing Guidelines*, 1 Judge J. 16, 28 (1989).

## ALEPH'S WORK IN ALTERNATIVE SENTENCING

*The Benefits of Alternatives to Incarceration*

The historical approach to sentencing, which uses incarceration as the default remedy for criminal conduct, has staggeringly high economic and societal costs. The United States spends nearly $300 billion annually to police communities and incarcerate 2.2 million people.[2] The societal costs of incarceration – lost earnings, adverse health effects, and the damage to the families of the incarcerated – are estimated at up to three times the direct costs, bringing the total burden of our criminal justice system to roughly $1.2 trillion each year.[3]  Whenever a court sentences an individual, it is not a stretch to say that it sentences an entire family, and the children of incarcerated individuals will suffer a permanent scar. Specifically, research shows that children of incarcerated parents demonstrate maladaptive symptoms, including behavioral problems, difficulties at school, depression, and an increased risk of winding up in prison themselves.[4]

Our many years of experience have taught us that, in certain cases, the goals of the criminal justice system can be accomplished by measures other than incarceration. The historic mindset that incarceration should be the default approach to malfeasance is failing both society and the individual. The weight of the evidence suggests little or no correlation between longer prison sentences (more than ten years) and reduced recidivism; indeed, the National Institute of Justice has concluded that "long prison sentences do little to deter people from committing future crimes."[5] In fact, longer sentences may slightly *increase* recidivism when compared to shorter sentences.[6] The imposition of long sentences on a large scale "offers diminishing returns for public safety."[7]

Aleph has developed the view that custodial sentences should be reserved for individuals who have a history of violence, as well as for those individuals (including certain nonviolent offenders) who may otherwise pose a danger to society if allowed to remain at liberty. Rather than being strictly

---

[2] https://www.bjs.gov/index.cfm?ty=pbdetail&iid=6728, Table 1.

[3] https://joinnia.com/wp-content/uploads/2017/02/The-Economic-Burden-of-Incarceration-in-the-US-2016.pdf.

[4] https://www.publichealthpost.org/research/incarcerations-costs-for-families/

[5] William Fitzpatrick, a former President of the National District Attorneys' Association, April 26, 2016 letter to Senators Mitch McConnell and Harry Reid. *See also* Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 CRIME & JUST. 199, 201 (2013) ("There is little evidence that increases in the length of already long prison sentences yield general deterrent effects that are sufficiently large to justify their social and economic costs.")

[6] Roger Pryzybylski, John Maki, Stephanie Kennedy, Aaron Rosenthal and Ernesto Lopez, *The Impact of Long Sentences on Public Safety: a Complex Relationship* (November 2022), Council for Criminal Justice, Task Force on Long Sentences.

[7] *Id.*

punitive, criminal punishments should be designed to confer a benefit on the victims of the offense and society as a whole, and provide appropriate support and rehabilitative services to the defendant.[8] This sentencing philosophy is reflected in every case that Aleph accepts: Aleph's advocacy is deeply rooted in its conviction that incarceration should not be used absent a compelling need. We agree with William Fitzpatrick, the former President of the National District Attorneys' Association, who suggested that society "use prison for those we are afraid of, not those whom we are mad at based upon their behavior."[9]

## *Aleph's Approach*

Aleph is among the very few non-profit organizations in the criminal justice arena that advocates not only for systemic changes but also directly on behalf of individuals facing criminal punishment. Aleph presents, to courts and prosecutors around the country, alternatives to incarceration for defendants who are selected by Aleph through a careful screening process. Aleph's Alternative Sentencing Department generally only advocates on behalf of individuals who are first-time offenders who have not committed a crime of violence. Aleph's alternative sentencing work is focused on individuals who have expressed clear and genuine remorse and a willingness to make amends for their conduct, and/or cases where there are compelling mitigating circumstances that justify a lower sentence. Aleph does not advocate for an alternative sentence in cases where it deems the individual to be a threat to public safety.

In addition to these requirements, Aleph makes an individualized assessment of the suitability of alternative sentencing, relying heavily on its vast experience compiled over four decades. Aleph has built a strong track record of credibility and success, in which many judges have imposed lower sentences based on one or more factors identified by Aleph in its written submissions and oral allocutions at sentencings. A recent review conducted by Covington & Burling LLP found that, in cases where Aleph made sentencing recommendations, sentencing judges relied on one or more factors identified by Aleph in imposing a sentence equal to or near to Aleph's recommendation in a majority of such cases.[10]

## *Crafting an Alternative Sentencing Proposal*

Legal scholars, the United States Supreme Court, and the rabbis at Aleph have all observed that prison is often not conducive to "promoting correction and rehabilitation."[11] This is because rehabilitation is a "forward-looking" concept, promoting resocialization by emphasizing "personal

---

[8] Talmud Berachos 606b; Likutei Torah Nasso.

[9] William Fitzpatrick, a former President of the National District Attorneys' Association, April 26, 2016 letter to Senators Mitch McConnell and Harry Reid.

[10] In several cases, the sentencing judge *expressly* relied (in whole or in part) on Aleph's submission in determining the sentence.

[11] *Tapia v. United States*, 131 S. Ct. 2382, 2387 (2011)*; see also* Benjamin L. Apt, *Do We Know How To Punish?* New Crim. L. Rev. 437, 460 (2016).

reform over punishment" and "illuminat[ing] the criminal's inner struggle,"[12] and as such only works when combined with an intense personal commitment to change. Though imprisonment may satisfy a thirst for retribution, the prison environment rarely inspires this commitment in the incarcerated individual. As Judge Richard Lowell Nygard once observed, "people – offenders included – change because they see something in themselves they do not like, and they reach down inside themselves and change it. Most criminal offenders who change for the better do so in spite of prison not because of it."[13]

Whereas prison may not promote rehabilitation, community-based programs like Aleph's proposals can be effective at restoring an individual's commitment to ethical behavior. Further, the same characteristics that may have made an individual such a source of strength for their own family and community will enhance the positive impact of their efforts for those with whom they interact under the terms of Aleph's proposal. We believe that individuals may best rehabilitate themselves through these efforts and that, in the process, they will push others to reach their full potential.

Aleph's sentencing proposals are designed to mete out appropriate, substantive punishment with the greatest benefit and lowest cost to society, while redirecting and enhancing an individual's value structure through social, therapeutic, and moral counseling and education. Every proposal Aleph submits carefully considers the traditional sentencing goals (retribution, rehabilitation, incapacitation, and deterrence), as well as the unique history and personal characteristics of each defendant, in an effort to provide effective correctional solutions. We typically advocate for sentences that include an alternative, non-custodial component – for example, community service, restorative justice, psychotherapy, or spiritual counseling. The non-custodial aspect of the sentence allows individuals to directly address the shortcomings that contributed to their offense, and also gives them an opportunity to use their sentence as a means to improve themselves and the world around them.

Aleph strives to craft alternative sentences that directly address the crime that brought an individual into the criminal justice system. An individual who serves the community that he or she has wronged, and employs his or her unique strengths to support those who need help, may have a truly redemptive and rehabilitative experience. For example, where appropriate, Aleph may recommend that individuals present "deterrence talks," whereby they share their personal experiences that led to their involvement in the criminal justice system, with other members of their community. In this way, the goals of both rehabilitation and deterrence are furthered: such individuals must directly and openly confront their wrongful conduct as a component of their rehabilitation, and others may be deterred from following a similar path. Selectively administered, such alternative sentences can provide individuals with an opportunity to improve themselves and the world around them, while also keeping them with their families and in their community, thereby limiting harmful collateral consequences.

---

[12] Benjamin L. Apt, *Do We Know How To Punish?* New Crim. L. Rev. 437, 458-60 (2016).

[13] Richard Lowell Nygaard, *Crime, Pain, and Punishment: A Skeptic's View*, 102 Dick. L. Rev. 355, 362-63 (1998).

*Taking a Leadership Role*

Motivated by this sentencing philosophy, Aleph endeavors to become a resource to those seeking to promote the more widespread use of alternative sentencing in appropriate cases, as well as the broader reform of the criminal justice system. In this role as advocate for a better approach to sentencing, we work to bring together thought leaders, judges, and prosecutors to improve the sentencing framework.

Aleph has sponsored and conducted two summits on sentencing and sentencing reform – one in 2016 at the Georgetown Law Center, entitled "Alternative Sentencing Key Stakeholders," and one in 2019 at Columbia Law School, entitled "Rewriting the Sentence." Both summits were attended by hundreds of criminal justice stakeholders, including federal and state judges, federal and state prosecutors, probation officers, private practitioners, academics, and others, from across the country. The focus of both summits was on bringing about a more enlightened and humane criminal justice system, in which individuals facing punishment are treated fairly and humanely, consistent with preserving the interests of their families, communities, victims, and society as a whole.

In October 2023, the Center for Justice and Human Dignity ("CJHD") (a 501(c)(3) non-profit organization that was incubated at and is supported by Aleph) will host another summit at George Washington University School of Law in Washington, DC, entitled "Rewriting the Sentence II Summit on Alternatives to Incarceration." This summit, which will build off Aleph's two prior summits, will serve as a dedicated forum where judges, prosecutors, and other decision-makers can come together to confront the complex challenges in addressing mass incarceration and its harmful consequences, including through the adoption of alternative sentencing programs and a reimagined approach to criminal justice. Together with CJHD, Aleph is also actively developing the Forum for Alternatives to Incarceration Resources, an online resource designed to provide a wealth of information and resources regarding alternative sentencing practices and implementation strategies throughout the United States.

## SUPPORTIVE STATEMENTS ABOUT ALEPH

Aleph has been publicly recognized numerous times for its outstanding contributions to improving the criminal justice system. The following is a selection of supportive statements about Aleph.

"The Aleph Institute is doing extraordinary fine work. Aleph helps in three ways. First, it explains to judges and the judicial system when and how alternatives to prison which protect the public are possible. Second, it helps those in prison develop their spiritual lives and maintain contact with their families and the world beyond their bars and barbed wire. Third, it assists those on the outside, particularly the children of prisoners, to retain their ties with prisoners. As a result of its good work, Aleph is widely known and respected by penal and judicial authorities."

> **—The Late Hon. Jack B. Weinstein,** Former Chief Judge of the U.S. District Court, Eastern District of New York.[14]

"For over 35 years Aleph has been championing and delivering justice to people who have been overlooked or forgotten by the rule of law, giving them hope, relief from suffering and the chance to improve their lives and fortunes. Both these individuals and the nation are the beneficiaries of Aleph's goodness and mission."

> **— Hon. Louis Freeh,** former U.S. District Judge, Southern District of New York, and former Director of the FBI, [at Aleph's 2016 ASKS Summit, Georgetown University Law Center.]

"While judging, in general, requires the application of law to the facts, sentencing requires more. It necessarily involves empathy and compassion, which Aleph surely brings to the table. At a time when sentencing principles are changing, Aleph's input is invaluable. It provides careful analysis of alternatives to incarceration entirely consistent with – and some may say better suited to – public safety. It provides a critical link between prisoners and their families and friends, making certain that prisoners – human beings – do not disappear behind the walls. Put simply, Aleph brings to bear its reservoirs of compassion and empathy, both before during and after punishment has been imposed, and has been doing so for 35 years."

> **—Hon. Nancy Gertner,** former U.S. District Judge, District of Massachusetts; Professor at Harvard Law School, [at Aleph's 2016 ASKS Summit, Georgetown University Law Center.]

"I think we are all in agreement this has been an extraordinary summit….35 years ago, a young Rabbi started some educational institutions, believing… that education was a fundamental right and goal of all people. He also had an interest—because of faith, belief and experience—that reforms could be made in the criminal justice system; to deal with defendants more humanely, to be aware of the impact on families, [and] the problem of reentry, and he started an institution to deal with these problems. Today we are the beneficiaries of that vision and that work."

> **—The Late Hon. Charles B. Renfrew,** U.S. Deputy Attorney General and U.S. District Judge, Northern District of California, [at Aleph's 2016 ASKS Summit, Georgetown University Law Center.]

"The Aleph Institute must be commended for its vision in bringing together at the ASKS Summit such diverse and interesting people and perspectives on the questions of criminal justice reform and sentencing alternatives in this era of mass incarceration."

> **—Hon. Judge Brooke Wells,** U.S. Magistrate Judge, District of Utah, at Aleph's 2016 ASKS Summit, Georgetown University Law Center.

---

[14] *Supra*, note 1.

"You at Aleph are doing extraordinary things on behalf of the judges in my court. We appreciate the work that you do."

> **—Hon. Joy Flowers Conti,** Senior U.S. District Judge, Western District of Pennsylvania.

"Today judges and lawyers, prosecutors and law enforcement communities…are engaged in trying to make certain that our system is fair. It takes a collaborative partnership and that's why I am so glad that all of us are here committed to making certain our justice system is the best that it can be. And I thank [Aleph] for being here. And I thank you for your continued great work."

> **—Hon. Bernice Donald,** former U.S. Circuit Judge for the Sixth Circuit.

"The many problems in our system cannot be addressed by simply building more prison beds. One of the keys of an effective Department of Corrections will be…great emphasis on alternatives to incarceration. Organizations such as the Aleph Institute will be key to any community-based programs."

> **—The Late Hon. Lawton Chiles,** former Governor, Florida.

"[Criminal Justice reform] is hard work and even if we do it thoughtfully, and with the openness and humanity it requires, there will inevitably be setbacks and disappointments…But it is work that draws its sustenance from the divine spark in each of us. I commend Aleph for its decades of commitment, and for convening such an impressive group of people and organizations."

> **—Hon. Jeremy Fogel,** former U.S. District Judge, Northern District of California, and former Director of the Federal Judicial Center, at Aleph's 2019 Rewriting the Sentence Summit, Columbia University Law School.

"Over the years, I have worked pro-bono on a number of matters with the Aleph Institute. The Institute's staff are incredibly dedicated, caring, smart, and hardworking. The Institute provides invaluable assistance to people from all walks of life and helps them find the justice they deserve with the compassion they need."

> **—Larry Thompson,** former U.S. Deputy Attorney General and former U.S. Attorney, Northern District of Georgia.

# Exhibit 9

(Filed Under Seal)

# Exhibit 10

(Filed Under Seal)

# Exhibit 11

 **New York Blood Center**

☰    LOG OUT

◀ Back To My Donations

# Full Donation History

Below are all of the donation records we have available. Online donation data is available dating back to June, 1981.

Show [ 100 ▾ ] entries

| Date | Procedure Type | Location |
|---|---|---|
| 05/30/2023 | Platelet | Grand Central Donor Center |
| 05/16/2023 | Platelet | Grand Central Donor Center |
| 05/02/2023 | Platelet | Grand Central Donor Center |
| 04/08/2023 | Platelet | Grand Central Donor Center |
| 03/08/2023 | Platelet | Grand Central Donor Center |
| 02/21/2023 | Platelet | Grand Central Donor Center |
| 02/05/2023 | Platelet | Grand Central Donor Center |
| 12/28/2022 | Platelet | Grand Central Donor Center |
| 11/19/2022 | Platelet | Grand Central Donor Center |
| 11/08/2022 | Platelet | Upper East Side Donor Center |
| 10/22/2022 | Platelet | Grand Central Donor Center |
| 09/24/2022 | Platelet | Upper East Side Donor Center |
| 09/17/2022 | Platelet | Upper East Side Donor Center |
| 09/03/2022 | Platelet | Upper East Side Donor Center |
| 08/21/2022 | Platelet | Grand Central Donor Center |

| Date ⬇ | Procedure Type ⇅ | Location ⇅ |
|---|---|---|
| 08/14/2022 | Platelet | Grand Central Donor Center |
| 08/07/2022 | Platelet | Grand Central Donor Center |
| 07/31/2022 | Platelet | Grand Central Donor Center |
| 06/18/2022 | Not Drawn | Grand Central Donor Center |
| 06/05/2022 | Platelet | Grand Central Donor Center |
| 05/29/2022 | Platelet | Grand Central Donor Center |
| 05/25/2022 | Platelet | Grand Central Donor Center |
| 05/15/2022 | Platelet | Grand Central Donor Center |
| 05/05/2022 | Platelet | Grand Central Donor Center |
| 04/23/2022 | Platelet | Grand Central Donor Center |
| 04/16/2022 | Platelet | Grand Central Donor Center |
| 04/05/2022 | Platelet | Grand Central Donor Center |
| 02/14/2022 | Whole Blood | Grand Central Donor Center |
| 02/03/2022 | Platelet | Grand Central Donor Center |

Showing 1 to 29 of 29 entries

First   Previous   1   Next   Last

New York Blood Center (NYBC) is one of the largest community-based, non-profit blood collection and distribution organizations in the United States.

© 2023 New York Blood Center

Privacy Policy. Terms

HemaConnect © 2023 InVita Healthcare Technologies

## About NYBC

Work Here

Press Room

## Get Connected

f   Facebook

🐦   Twitter

▶   Youtube

## Support Us

Donate Blood

Volunteer

Make a Financial Contribution

Instagram

---

## Contact

310 E 67th St
New York, NY 10065
(800) 933-2566
Contact New York Blood Center

---

## Today's Blood Drives



View today's drives.

# Volunteer Service History

**Today's Date**
6/3/2023

**Volunteer Name**
Jeffrey S Parket

| Date | Hours | Signature |
|------|-------|-----------|
| 2/28/2022 | 2 | |
| 3/2/2022 | 2 | |
| 3/7/2022 | 2 | |
| 3/11/2022 | 2 | |
| 3/16/2022 | 2 | |
| 3/28/2022 | 2 | |
| 3/30/2022 | 2 | |
| 4/15/2022 | 2 | |
| 4/25/2022 | 2.25 | |
| 4/28/2022 | 2.25 | |
| 5/3/2022 | 2.25 | |
| 5/8/2022 | 2.25 | |
| 5/13/2022 | 2.25 | |
| 5/24/2022 | 2.25 | |
| 5/28/2022 | 2.25 | |
| 5/30/2022 | 2.25 | |
| 6/3/2022 | 2.25 | |
| 6/11/2022 | 2.25 | |
| 6/12/2022 | 2.25 | |
| 6/15/2022 | 2.25 | |
| 6/21/2022 | 2.25 | |

| | | |
|---|---|---|
| 6/24/2022 | 2 | |
| 6/26/2022 | 2.25 | |
| 6/28/2022 | 2.25 | |
| 7/7/2022 | 2.25 | |
| 7/7/2022 | 1.5 | |
| 7/12/2022 | 2.25 | |
| 7/18/2022 | 2.25 | |
| 7/28/2022 | 2.25 | |
| 8/3/2022 | 2.25 | |
| 8/11/2022 | 2.25 | |
| 8/16/2022 | 2.25 | |
| 8/24/2022 | 2.25 | |
| 5/2/2023 | 2 | |
| 5/16/2023 | 2 | |
| 5/30/2023 | 2 | |
| **Total** | **77.25** | |

# Exhibit 12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

      -v-

JEFFREY SOBERMAN PARKET,

            Defendant.

1:22-cr-00311 (MKV)

**Declaration of
Professor Crystal S. Yang**

---

Pursuant to 28 U.S.C. §1746, I, CRYSTAL S. YANG, J.D., Ph.D., declare under penalty of perjury that the following is true and correct:

1. I am the Bennett Boskey Professor of Law at Harvard Law School and Research Associate at the National Bureau of Economic Research.  My primary research areas are in criminal law and criminal procedure, with a focus on analyzing sentencing outcomes in the federal criminal justice system.  Before joining the Harvard Law School faculty, I was an Olin Fellow and Instructor in Law at The University of Chicago Law School.  I am admitted to the New York State Bar and previously worked as a Special Assistant United States Attorney in the U.S. Attorney's Office for the District of Massachusetts.

2. I received a B.A. in economics *summa cum laude* from Harvard University in 2008, an A.M. in statistics from Harvard University in 2008, a J.D. *magna cum laude* from Harvard Law School in 2013, and a Ph.D. in economics from Harvard University in 2013.  My undergraduate and graduate training involved substantial coursework in quantitative methods.

3. I have published in peer-reviewed journals such as the *American Economic Review*, *The Quarterly Journal of Economics*, and the *American Economic Journal: Economic Policy*, and have work represented in many other peer-reviewed journals and outlets.

4. I make this Declaration in support of a sentencing memorandum being submitted by the defendant in this case, Jeffrey Parket.

**Statistical Analyses Pertinent to Memorandum**

5.  I was retained through Empirical Justice Inc. by the Federal Defenders of New York, counsel for Jeffrey Parket, for consulting services on behalf of Mr. Parket in this case.  Specifically, I was asked to analyze sentencing statistics compiled by the United States Sentencing Commission.

6.  In the following table and figures, I report summary statistics on defendants sentenced under the United States Sentencing Guidelines ("U.S.S.G.") in the federal court system.  I obtained these publicly available data from the United States Sentencing Commission, which collects data on all felony and class A misdemeanor offenses for which sentences are imposed in the federal courts.  Specifically, I compiled the Sentencing Commission's records on all cases sentenced between 2006 and 2021, the most recent available data, and I analyzed summary statistics for that time period in three geographic areas.

    a.  The three geographic areas are: (1) the Southern District of New York ("S.D.N.Y."), (2) all federal district courts in the Second Circuit ("2d Circuit"), and (3) all federal district courts in the 50 U.S. states and the District of Columbia ("National").[1]

    b.  The key outcome of interest is the total prison sentence (excluding alternative confinement, such as home confinement) in months. A sentence of probation is indicated by a zero ("0").

7.  Counsel for Mr. Parket has represented that the Guidelines calculation in Mr. Parket's case is U.S.S.G. § 2B1.1, offense level 32, and criminal history category I.

8.  In Table 1, I report summary statistics for (i) defendants who received cooperation credit under U.S.S.G. § 5K1.1 that were sentenced under U.S.S.G. § 2B1.1 with an offense level of 32 and criminal history category of I ("Cooperators"); (ii) all defendants that were sentenced under U.S.S.G. § 2B1.1 with an offense level of 32, criminal history category of I, including those who received cooperation credit under U.S.S.G. § 5K1.1 and those who did not receive such cooperation credit ("All Defendants"); and (iii) defendants who did not receive cooperation credit under U.S.S.G. § 5K1.1 that were sentenced under U.S.S.G. § 2B1.1 with an offense level of 32 and criminal history category of I ("Non-Cooperators").

    a.  Each cell of Table 1 presents the length of the mean sentence, the 25th percentile sentence, the 50th percentile sentence, and the 75th percentile sentence. Each cell also reports the total number of sentences that fall in that cell.

---

[1] The National geographic area also includes the Virgin Islands, Guam, and the Northern Mariana Islands.

    b.  The 50th percentile, or median value, is the middle number in a set of sorted numbers. Thus, if the median sentence received by people in a particular data set is 0.15 months, then half of the people sentenced received sentences of 0.15 months (about 5 days) or less.

9.  Figure 1.1 shows the distribution of prison sentences (in months) from 2006-2021 in the 2d Circuit area.

10.  Figure 1.2 shows the distribution of prison sentences (in months) from 2006-2021 in the National area.

**Table 1.  Sentences in Months for USSG §2B1.1, Criminal History I, Offense Level 32, 2006-2021: Cooperators vs. All Defendants vs. Non-Cooperators. [N=410].**

|  | **Cooperators** | **All Defendants** | **Non-Cooperators** |
|---|---|---|---|
| **S.D.N.Y.** | Avg Time = 19.17<br>25th Percentile = 0.00<br>Median = 0.03<br>75th Percentile = 34.79<br>[N = 11]<br>min: 0 max: 120.0 SD: 37.33 | Avg Time = 51.57<br>25th Percentile = 0.03<br>Median = 39.00<br>75th Percentile = 96.00<br>[N = 26]<br>min: 0 max: 121.0  SD: 45.6123 | Avg Time = 75.33<br>25th Percentile = 36.00<br>Median = 72.00<br>75th Percentile = 110.00<br>[N = 15]<br>min: 24.00 max: 121.0 SD: 35.9159 |
| **2ᵈ Circuit** | Avg Time = 20.62<br>25th Percentile = 0.03<br>Median = 3.00<br>75th Percentile = 23.41<br>[N = 24]<br>min: 0 max: 120.0 SD: 36.39 | Avg Time = 43.45<br>25th Percentile = 3.00<br>Median = 36.00<br>75th Percentile = 72.00<br>[N = 47]<br>min: 0  max: 151.0  SD: 44.80 | Avg Time = 67.26<br>25th Percentile = 36.00<br>Median = 60.00<br>75th Percentile = 100.00<br>[N = 23]<br>min: 0  max: 151.00 SD: 40.6283 |
| **National** | Avg Time = 47.15<br>25th Percentile = 12.03<br>Median = 48.00<br>75th Percentile = 76.00<br>[N = 104]<br>min: 0 max: 120.0 SD: 34.18 | Avg Time = 85.72<br>25th Percentile = 60.00<br>Median = 84.00<br>75th Percentile = 121.00<br>[N = 410]<br>min: 0 max: 360.0 SD: 46.26 | Avg Time = 98.83<br>25th Percentile = 68.00<br>Median = 97.00<br>75th Percentile = 121.00<br>[N = 306]<br>min: 0 max: 360.0 SD: 42.3776 |

Note: This table presents summary statistics on prison sentence lengths in months (including 0s for probation) for three different geographies.  The first number in each cell represents the mean sentence length, the second number represents the 25th percentile sentence length, the third number represents the 50th percentile (median) sentence length, and the fourth number represents the 75th percentile sentence length.  The number of sentences in each cell is represented in brackets. The last line of each cell gives the minimum sentence ("min"), maximum sentence ("max"), and the standard deviation ("SD") of sentence lengths in that cell.

**Figure 1.1: 2d Circuit, All Cases [N=47]**



Note that the Sentencing Commission codes sentences of time served as having a sentence length of 0.03 months. For that reason, in some figures there can sometimes be more than one percentage label in the "0" months bar.

4

**Figure 1.2:  National, All Cases [N=410]**



Note that the Sentencing Commission codes sentences of time served as having a sentence length of 0.03 months. For that reason, in some figures there can sometimes be more than one percentage label in the "0" months bar.


Dated:  June 6, 2023


      /s/ Crystal S. Yang

Crystal S. Yang, J.D., Ph.D.